## MT. ADAMS & E. P. INCLINED RY. CO. v. LOWERY.

### (Circuit Court of Appeals, Sixth Circuit. May 12, 1896.)

### No. 369.

1. WITNESS—EXAMINATION—LEADING QUESTIONS—SEVERAL DEFENDANTS.
    Where there are two defendants, each making separate defenses, or where each is endeavoring to cast the fault upon the other, it is not error if the trial judge, in the exercise of his discretion, shall disallow leading questions propounded by one defendant in the cross-examination of plaintiff's witnesses, when objected to by the other defendant.

2. PRACTICE—DIRECTION OF VERDICT—WAIVER.
    When a defendant, at the close of the plaintiff's case, asks for a direction of a verdict in his favor, which is refused, if he thereafter introduces evidence he waives all right to assign error upon the court's refusal to grant his request.

3. SAME—INSUFFICIENCY OF EVIDENCE.
    There is a difference between the legal discretion of the court to set aside a verdict as against the weight of evidence, and that obligation which the court has to withdraw a case from the jury, or direct a verdict, for insufficiency of evidence. In the latter case it must be so insufficient in fact as to be insufficient in law, amounting to an absence of any material and substantial evidence which, if credited by the jury, would in law justify a verdict in favor of the other party; and it is not a proper test of whether the court should direct a verdict, that the court, on weighing the evidence, would upon motion grant a new trial. It is the duty of the court, when a motion is made to direct a verdict, to take that view of the evidence most favorable to the party against whom it is desired that a verdict should be directed, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not, under the law, a verdict might be found for that party.

4. SAME.
    One L. brought an action against a cable street railway company for damages for personal injuries. It appeared that L. was sitting on the front seat of a cable car which was going up a hill; that an ice wagon which was coming down the hill on the down car track turned on to the up track; that the car and wagon collided, and L. was injured. Repairs were being made to the street and the part of the roadway between the

down track, and the curb was barricaded, and at the time of the accident, which occurred at dusk, a red lantern was hung on the barricade. The gripman of the car testified that the wagon turned out from behind a car on the down track, when not more than 10 feet behind such car and 20 feet ahead of his own car; that he had not seen the wagon before, because of the car on the down track; that as soon as he saw it he released his grip and applied his brake, and stopped his car within six feet; that the wagon, after starting to cross the up track, turned back and ran into his car while it was standing still. The driver of the wagon testified that he was driving at least two blocks behind the down car; that his horses shied at the red light, and turned partly onto the up track; that the car came up at a fast speed, and did not slow up when the horses turned onto the up track. There was also some evidence to show that the wagon was traveling at about five miles an hour, and some that it was traveling much faster. *Held*, that it was not error to refuse to direct a verdict for the defendant.

Error to the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

This is an action for injuries to a passenger on a cable street car in the city of Cincinnati. The defendant in error, Joseph A. Lowery, was injured by riding on the front seat of an open grip car, by reason of a collision between a car going north on Gilbert avenue and a large ice wagon going south. The wagon belonged to the Cincinnati Ice Company, and his action for damages was brought against both the car company and the ice company, alleging negligence upon the part of both. During the course of the trial, it appeared that the driver of the ice wagon was out upon a private expedition of his own, whereupon the court, being of opinion that the ice company was not responsible for the negligence of the driver, under such circumstances, directed a verdict in its favor. The case then proceeded against the railway company as sole defendant, and resulted in a verdict for the plaintiff for $7,500.

W. W. Ramsay and Robert Ramsay, for plaintiff in error.
Chas. W. Baker, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

There are five errors assigned to the action of the court below. The first is as follows:

"The court erred in sustaining the objection of the defendant the Cincinnati Ice Company to the following question asked the witness Annie Redman: 'Q. From the time you saw those horses turn, until the collision, how long was it? Wasn't it about a second or two?'"

There were two defendants, the ice company and the street-railway company, and each was represented by its own counsel. Each was interested in showing that the fault, if any, was the fault of the other, or in showing mutual negligence, so that the judgment, if any, would be joint. The question was a leading one, propounded by counsel for the railway company upon cross-examination of a witness who had been examined by the plaintiff. The question was objected to by the ice company. Where there are two defendants, each making separate defenses, or where each is endeavoring to cast the fault upon the other, it is not error if the trial judge, in the exercise of his discretion, shall disallow leading questions propounded

by one defendant, when objected to by the other.    Sanger v. Flow, 4 U. S. App. 32, 1 C. C. A. 56, and 48 Fed. 152.

The second error assigned is that it was error in the court to refuse to direct a verdict for the defendant at the close of the plaintiff's evidence.    This is a bad assignment.    The defendant thereafter introduced evidence, and waived thereby all right to assign error upon this action of the court.

The fifth error assigned can best be considered at this point.    It is that the court erred in refusing to direct a verdict for the defendant at the close of all the evidence.    In support of this motion the entire facts of the case have been elaborately argued.    Under the repeated rulings of this court, as well as of the supreme court, it must be regarded as well settled that upon a writ of error no question can be raised as to whether the verdict was against the weight of the evidence.    That was a question for the sole determination of the trial judge upon the motion for a new trial.    His action in refusing a new trial upon that ground cannot be assigned as error. The motion for a peremptory direction at the close of all the evidence was based upon the supposed insufficiency of the evidence, in point of law, to establish any negligence against the street-railway company.    What possible care and skill did that company fail to use, which, if they had used, the collision might have been avoided? In the solution of this question we are not to weigh the evidence, nor to determine the value of conflicting evidence.    The question, when a motion to direct a verdict is made, is this:    Is there any material and substantial evidence, which, if credited by the jury, would in law justify a verdict in favor of the other party?    If there was, it cannot be held error that the trial judge declined to direct the verdict, and submitted the value of that evidence to the consideration of the jury.    The duty of a trial judge under such circumstances was much considered in Railway Co. v. Slattery, 3 App. Cas. 1155, where, though the court was divided in opinion as to the result, there was great unanimity of judgment as to the proper rule where there is any substantial conflict of evidence.    In that case it was held, after great deliberation (no less than eight of the law lords delivering separate opinions), that "where there is conflicting evidence on a question of fact, whatever may be the opinion of the judge who tries the cause as to the value of that evidence, he must leave the consideration of it for the decision of the jury."    In that case the question on appeal was not whether the verdict was against the evidence, but whether the trial judge should have directed a verdict.    The negligence of the railroad company turned upon the question as to whether the whistle of the engine had been sounded at a place where it should have been.    Three witnesses said it had not been sounded.    Ten others said it had.    Lord Cairns, as to this, and as to the duty of an appellate tribunal, said:

"There is thus opposed to the evidence of two persons who say they did not hear (which may mean that they did not observe) the whistle, and of one who says he did not hear it, but will not swear that it did not take place, a body of witnesses, ten in number, including every person whose evidence could be supposed to be material, all of whom seem to me to be entirely unimpeached

and unimpeachable, who state in the most positive way that the whistling did take place. My lords, I have already said that your lordships have not now before you the question of whether the verdict was against evidence or against the weight of evidence. But I feel bound to say that, if that question were now open, I should, without hesitation, be of opinion that a verdict more directly against evidence I have seldom seen. It is stated that the learned judge before whom the case was tried was not dissatisfied with the verdict. I can only express my surprise that this should have been the case. As it is, it appears to me that the jury, actuated perhaps by feelings of compassion for a plaintiff who is no doubt much to be pitied, and willing to gratify those feelings at the expense of the appellants, have found the first issue, that of negligence on the part of the appellants, for the respondent, when it ought to have been found for the appellants. This, however, as I have already said, is not a reason for entering the verdict for the defendant. It is only a ground for a new trial."

Lord Hatherley, in the same case, said:

"I will, in the first place, state my concurrence with Mr. Justice Barry's opinion in the court below (1) viz. 'When once a plaintiff has adduced such evidence as, if uncontradicted, would justify and sustain a verdict, no amount of contradictory evidence will justify the withdrawal of the case from the jury.'"

In Greenleaf v. Birth, 9 Pet. 292–298, the rule was thus stated:

"Where there is no evidence tending to prove a particular fact, the court are bound to so instruct the jury, when requested, but they cannot lawfully give any instruction which shall take from the jury the right of weighing the evidence and determining what effect it shall have."

In U. S. v. Laub, 12 Pet. 1–3, it was said:

"It is a point too well settled to be now drawn in question that the effect and sufficiency of the evidence are for the consideration and determination of the jury; and the error is to be redressed, if at all, by application to the court below for a new trial, and cannot be made a ground of objection on a writ of error."

In Insurance Co. v. Doster, 106 U. S. 30–32, 1 Sup. Ct. 18. Mr. Justice Harlan said:

"The motion, at the close of the plaintiff's evidence, for a peremptory instruction for the company, was properly denied. It could not have been allowed without usurpation upon the part of the court of the functions of the jury. Where a cause fairly depends upon the effect or weight of testimony. it is one for the consideration and determination of the jury, under proper directions as to the principles of law involved. It should never be withdrawn from them unless the testimony be of such a conclusive character as to compel the court, in the exercise of a sound judicial discretion, to set aside a verdict returned in opposition to it."

In Railroad Co. v. Cox, 145 U. S. 593–606, 12 Sup. Ct. 905, Chief Justice Fuller said:

"The case should not have been withdrawn from the jury unless the conclusion followed, as a matter of law, that no recovery could be had upon any view which could be properly taken of the facts the evidence tended to establish."

Neither is the question as to whether there is such a conflict as should be submitted to the jury determined by the mere fact that there is some evidence tending to support the case of the party having the onus of proof. There must be something more than a bare scintilla. It may be that no certain standard can be set up by which a court may draw the line between evidence of so slight and

vague a character as to amount to a mere scintilla, and evidence le-
gally sufficient to entitle the party offering it, if uncontradicted, to
a verdict.   The "scintilla rule," so called, is not recognized by the
supreme court, nor by the English courts.   In these courts it is well
settled that there is always a preliminary question for the court.
That question is whether or not the party having the onus has pro-
duced evidence upon which the jury might reasonably find for that
party.   In Toomey v. Railway Co., 3 C. B. (N. S.) 150, it was said:

"A scintilla of evidence, or a mere surmise that there may have been neg-
ligence on the part of the defendants, clearly would not justify the judge in
leaving the case to the jury.   There must be evidence upon which they might
reasonably and properly conclude that there was negligence."

In Jewell v. Parr, 13 C. B. 916, Maule, J., said:

"Applying the maxim, 'De minimis non curat lex,' when we say that there
is no evidence to go to the jury we do not mean that there is literally none, but
that there is none which ought reasonably to satisfy a jury that the fact to be
proved is established."

In Ryder v. Wombwell, L. R. 4 Exch. 36, the question was as to
whether certain articles which had been sold to an infant were neces-
saries.   Willes, J., discussing the question as to whether there was a
case to be submitted to the jury, said:

"In the present case the first question is whether there was any evidence to
go to the jury that either of the above articles was of that description.   Such
a question is one of mixed law and fact.   In so far as it is a question of fact,
it must be determined by a jury, subject, no doubt, to the control of the court,
who may set aside the verdict, and submit the question to the decision of
another jury.   But there is in every case, not merely those arising on a plea
of infancy, a preliminary question which is one of law, viz. whether there is
any evidence on which the jury could properly find the question for the party
on whom the onus of proof lies.   If there is not, the judge ought to with-
draw the question from the jury, and direct a nonsuit, if the onus is on the
plaintiff, or direct a verdict for the plaintiff if the onus is on the defendant.
It was formerly considered necessary in all cases to leave the question to the
jury if there was any evidence, even a scintilla, in support of the case; but
it is now settled that the question for the judge (subject, of course, to review)
is, as stated by Maule, J., in Jewell v. Parr, not whether there is literally
no evidence, but whether there is none that ought reasonably to satisfy the
jury that the fact sought to be proved is established.   In Toomey v. Railway
Co., Williams, J., enunciates the same idea thus: 'It is not enough to say
that there was some evidence. * * * A scintilla of evidence * * *
clearly would not justify the judge in leaving the case to the jury.   There
must be evidence on which they might reasonably and properly conclude that
there was negligence,'—the fact in that case to be established.   And in
Wheelton v. Hardisty [8 El. & Bl. 232], in the considered judgment of the
majority of the court, it is said, 'The question is whether the proof was such
that the jury would reasonably come to the conclusion' that the issue was
proved.   'This,' they say, 'is now settled to be the real question in such cases,
by the decision in the exchequer chamber, which have, in our opinion, so
properly put an end to what had been treated as the rule, that a case must
go to the jury if there were what had been termed a scintilla of evidence.' "

In Giblin v. McMullen, 2 L. R. P. C. 335, Lord Chelmsford said:

"Formerly it used to be held that, if there were what was called a scintilla
of evidence in support of a case, the judge was bound to leave it to the jury.
But a course of recent decisions (most of which are referred to in the case
of Ryder v. Wombwell) has established a more reasonable rule, viz. that in
every case, before the evidence is left to the jury, there is a preliminary ques-
tion for the judge,—not whether there is literally no evidence, but whether

there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed. If, therefore, the plaintiff's evidence in this case was such that the judge ought to have considered that it fell short of proving the bank to have been guilty of that species of negligence which would render them liable to an action, he ought to have withdrawn the case from the jury, and directed a nonsuit."

In Railway Co. v. Jackson, 3 App. Cas. 193, the court, referring to the misapprehension which had existed as to the meaning intended by the language of the court in the case of Bridges v. Railway Co., L. R. 7 H. L. 213, said:

"The judge has a certain duty to discharge, and the jurors have another and a different duty. The judge is to say whether any facts have been established by evidence, from which negligence may be reasonably inferred. The jurors have to say whether, from these facts, when submitted to them, negligence ought to be inferred. It is, in my opinion, of the greatest importance in the administration of justice that these separate functions should be maintained distinct."

In Denny v. Williams, 5 Allen, 5, the court, in considering the circumstances under which it was proper for a judge to support the verdict, after saying that a bare scintilla of evidence might not make it a case for proper submission to the jury, said:

"What this scintilla is needs to be stated a little more definitely, otherwise it may be understood to include all cases where, on a motion for a new trial, a verdict would be set aside as against the weight of evidence. It would be impossible to draw a line theoretically, because evidence, in its very nature, varies from the weakest to the strongest by imperceptible degrees. But the practical line of distinction is that if the evidence is such that the court would set aside any number of verdicts rendered upon it, toties quoties, then the cause should be taken from the jury, by instructing them to find a verdict for the defendant. On the other hand, if the evidence is such that, though one or two verdicts rendered upon it would be set aside on motion, yet a second or third verdict would be suffered to stand, the case should not be taken from the jury, but should be submitted to them under instructions. This rule throws upon the court a duty which may sometimes be very delicate, but it seems to be the only practical rule which the nature of the case admits."

In Parks v. Ross, 11 How. 362–372, Mr. Justice Grier said:

"It is undoubtedly the peculiar province of the jury to find all matters of fact, and the court to decide all questions of law arising thereon. But the jury has no right to assume the truth of any material fact without some evidence legally sufficient to establish it. It is therefore error in the court to instruct the jury that they may find a material fact, of which there is no evidence from which it may be legally inferred. Hence the practice of granting an instruction like the present, which makes it imperative upon the jury to find a verdict for the defendant, and which in many states has superseded the ancient practice of a demurrer to evidence. It answers the same purpose, and should be tested by the same rules. A demurrer to evidence admits, not only the facts stated therein, but also every conclusion which a jury might fairly or reasonably infer therefrom."

This is followed in Schuchardt v. Allens, 1 Wall. 359–369 et seq. In that case Mr. Justice Swayne, speaking for the court, said:

"If the evidence be not sufficient to warrant a recovery, it is the duty of the court to instruct the jury accordingly. This is equivalent to a demurrer to the evidence, and such an instruction ought to be given whenever the evidence is not legally sufficient to serve as the foundation of a verdict of the plaintiff. It is enough that there was evidence upon the subject proper to be left to the consideration of the jury. If the jury erred, the remedy was by a

motion for a new trial, and not by a writ of error. This part of the case was argued as if such a motion was before us. The rules of law which would be applicable in that event are very different from those which apply as the case is presented."

The next case is Improvement Co. v. Munson, 14 Wall. 442, in which Mr. Justice Clifford, speaking for the court, said:

"Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that, if there was what is called a scintilla of evidence in support of a case, the judge was bound to leave it to the jury; but recent decisions of high authority have established a more reasonable rule,—that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

The next and perhaps the leading case on the subject is that of Pleasants v. Fant, 22 Wall. 116. Mr. Justice Miller delivered the opinion of the court. He said in the course of it, after referring to the issue in the suit upon which a verdict must depend:

"But we are pressed with the proposition that it was for the jury to decide this question, because the testimony received and offered had some tendency to establish a participation in the profits, and the question of liability, under such circumstances should have been submitted to them, with such declarations of what constitutes a partnership as would enable them to decide correctly. No doubt there are decisions to be found which go a long way to hold that, if there is the slightest tendency in any part of the evidence to support plaintiff's case, it must be submitted to the jury; and in the present case, if the court had so submitted it, with proper instructions, it would be difficult to say that it would have been an error of which the defendant could have complained here. But, as was said by this court in the case of the Improvement Co. v. Munson, recent decisions of high authority have established a more reasonable rule,—that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed. The English cases there cited fully sustain the proposition, and the decisions of this court have generally been to the same effect."

Parks v. Ross; Schuchardt v. Allens; Pawling v. U. S., 4 Cranch, 219; Bank v. Smith, 11 Wheat. 171. After commenting upon these cases the learned justice proceeded:

"It is the duty of a court, in its relation to the jury, to protect parties from unjust verdicts arising from ignorance of the rules of law and of evidence, from impulse of passion or prejudice, or from any other violation of his lawful rights in the conduct of a trial. This is done by making plain to them the issues they are to try; by admitting only such evidence as is proper in the issues, and rejecting all else; by instructing them in the rules of law by which that evidence is to be examined and applied; and finally, when necessary, by setting aside a verdict which is unsupported by evidence, or contrary to law. In the discharge of this duty, it is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor; not whether, on all the evidence, the preponderating weight is in his favor,—that is the business of the jury,—but conceding to all the evidence offered the greatest probative force which, according to the law of evidence, it is fairly entitled to, is it sufficient to justify a verdict? If it is not, then it is the duty of the court, after a verdict, to set it aside and grant a new trial. Must the court

go through the idle ceremony, in such a case, of submitting to the jury the testimony on which plaintiff relies, when it is clear to the judicial mind that, if the jury should find a verdict in favor of plaintiff, that verdict would be set aside, and a new trial had? Such a proposition is absurd, and accordingly we hold the true principle to be that if the court is satisfied that, conceding all the inferences which the jury could justifiably draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the court should say so to the jury. In such case the party can submit to a nonsuit, and try his case again, if he can strengthen it, except where the local law forbids a nonsuit at that stage of the trial, or, if he has done his best, he must abide the judgment of the court, subject to the right of review, whether he has made such a case as ought to be submitted to the jury,—such a case as a jury might justifiably find for him a verdict."

Neither is it a proper standard to settle for a peremptory instruction that the court, after weighing the evidence in the case, would, upon a motion for a new trial, set aside the verdict. The court may, and often should, set aside a verdict, when clearly against the weight of evidence, where it would not be justified in directing a verdict. Neither do we understand this view to be in conflict with anything decided by the supreme court. When that court said in Insurance Co. v. Doster, cited heretofore, that a case should not be withdrawn from the jury "unless the testimony be of such a conclusive character as to compel the court, in the exercise of a sound judicial discretion, to set aside a verdict returned in opposition to it," it did not mean to define the limits within which a trial judge might and ought to grant a new trial because against evidence, or against the weight of evidence. Many cases occur, in the history of nisi prius trials, where a new trial ought to be granted because the verdict is clearly against the weight of evidence, when it would have been erroneous to have directed a verdict in the first instance. Still there is no absolute rule justifying a new trial merely because the trial judge would, upon weighing the evidence, have found contrary to the view of the jury. He must exercise a sound judicial discretion,—a discretion not reviewable in appellate courts of the United States upon writ of error. In illustration of the limits within which this discretion may properly be exercised, we cite some instances:

In Burton v. Thompson, 2 Burrows, 664, Lord Mansfield said:

"It does not follow, by necessary consequence, that there must be a new trial granted, in all cases whatsoever, where the verdict is contrary to evidence; for it is possible that the verdict may still be on the side of the real justice and equity of the case. And of this there are several instances in the printed books, particularly the Duchess of Mazarine's Case, in 2 Salk. 646."

He added:

"Therefore I do not think that we ought to interfere merely to give the plaintiff an opportunity of harassing the defendant, at a great expense to himself, where there has been no real damage, and where the injury is so trivial as not to deserve above a half crown compensation."

A new trial will not be granted, though against the evidence, if found for the defendant, if the action was frivolous, trifling, and vexatious. Macrow v. Hull, 1 Burrows, 11.

In Farewell v. Chaffey, 1 Burrows, 54, Lord Mansfield said: "A new trial ought to be granted to obtain real justice, but not to grat-

ify litigious passions," and cited Smith v. Brampston and Smith v. Frampton, 2 Salk. 644, and other old cases.    In this case he said:

"The verdicts were against evidence and the strict rule of law, * * * but the court would not give a second chance of success to a hard action or unconscionable defense."

In Norris v. Freeman, 3 Wils. 39, the court said:

"There are many cases where the court will grant new trials notwithstanding there was evidence on both sides, as where all the light has not been let in at the trial which might and should have been."

In an anonymous case referred to in 1 Wils. 22, the report is as follows:

"On a motion for a new trial in an action by the owner of the inheritance for making a dam across an ancient water course, the judge who tried the cause certified that six witnesses were examined at the trial, on each side; that the jury found for the defendant, which was against his opinion; but that he could not take upon himself to say that this was a verdict against evidence, because there was evidence on both sides.    So a new trial was refused."

In the case of Swinnerton v. Marquis of Stafford, 3 Taunt. 233, one new trial had been granted after a verdict against the defendant. Upon a second trial a second verdict was found against the defendant.    Upon a motion for a third trial, Mansfield, C. J., said:

"I think it is impossible in this case to grant you a rule.   Upon the last occasion we went as far as we could go, because it was an important case, and decided the right to the inheritance of this land, which was to be assigned in lieu of common.   On the former trial, Williams, Serjt., strongly insisted to the jury on the grant of common to the priory of Stone, whose property afterward came to Lord Stafford, and we thought it might have prejudiced the mind of the jury, though it was rejected. If it had been evidence, it would have been decisive of the matter; but we thought the case not sufficiently understood, and sent it to a new trial.   The jury, who are the competent judges, have again had the case before them, and have decided it.   Even if, on nicely scrutinizing all the evidence, we had a doubt whether the verdict was right, it could never be right for us to make no weight of two verdicts of a jury in order to take the chance of a third."

In Solomon v. Bitton, 8 Q. B. Div. 177, the court said that the—

"Rule on which a new trial should be granted on the ground that the verdict was unsatisfactory, as being against the weight of evidence, ought not to depend on the question whether the learned judge who tried the action was or was not dissatisfied with the verdict, or whether he would have come to the same conclusion as the jury, but whether the verdict was such as reasonable men ought [not] to have come to."

In the subsequent case of Webster v. Friedeberg, 17 Q. B. Div. 736, Lord Esher, M. R., in referring to Solomon v. Bitton, said—

"That Jessel, M. R., considered that the language which he then used was not correctly reported, and that the word 'not' should be inserted after the word 'ought.'  In future, when that case is referred to, we shall read the judgment as if it ran, 'such as reasonable men ought not to have come to'; and I have corrected the court copy accordingly."

He further said:

"But it is idle to say that, in determining whether a verdict was against the weight of evidence, you must not take into serious consideration the opinion of the judge who tried the case.   No one has ever said that his opinion is conclusive, but it is a matter to be taken into serious consideration."

In Railway Co. v. Wright, 11 App. Cas. 152, Lord Selborne said:

"In many cases the principles on which new trials should be granted on the ground of difference of opinion which may exist as to the effect of the evidence have been considered, both in the house of lords and in the lower courts; and I have always understood that it is not enough that the judge who tried the case might have come to a different conclusion on the evidence than the jury, or that the judges in the court where the new trial is moved for might have come to a different conclusion, but there must be such a preponderance of evidence, assuming that there is evidence on both sides to go to the jury, as to make it unreasonable, and almost perverse, that the jury, when instructed and assisted properly by the judge, should return such a verdict. If I am at all right in that view, then I may say I cannot come to the conclusion that this is a verdict which, upon the evidence before them, the jury were not well entitled to find."

In Phillips v. Martin, 15 App. Cas. 194, the question was whether the verdict was against the evidence, or weight of evidence. The judgment of their lordships was delivered by Lord Macnaghten:

"It is settled that a verdict ought not to be disturbed on that ground unless, to use the words of Lord Herschell in Railway Co. v. Wright, 'it was one which a jury, viewing the whole of the evidence reasonably, could not properly find.'"

Upon a motion for a new trial because the verdict was against the evidence, it was said in Brisbane v. Martin, 19 App. Cas. 252, that the question was:

"Was this verdict one which the jury, reasonably viewing the whole of the evidence, could properly find? It is not necessary for their lordships to say how far they concur in the verdict. That is not the question. There being evidence both ways, it cannot be said that the jury might not reasonably arrive at the conclusion at which they did arrive."

In Newspaper Co. v. Bennett, 19 App. Cas. 287, it was said:

"The only point to be determined is whether the verdict found by the jury, for whose consideration it essentially was, was such as no jury could have found, as reasonable men."

In Lunt v. Railway Co., L. R. 1 Q. B. 281-288, there had been a former verdict, which had been set aside as against the weight of evidence. Upon motion to award a second new trial, Blackburn, J., said:

"The court never interferes except in a very strong case, almost amounting to the miscarriage of justice, and I see nothing of that kind in the present case."

In the same case, Lush, J., said:

"I need only say, as to the new trial, that, although I should have come to a different conclusion, I agree that, after two juries have come to the same conclusion, we ought not to send the case back for a third trial."

The rule in the American courts seems to be that, if the verdict be clearly and manifestly against the evidence or the weight of evidence, a new trial should be granted. Wait v. McNeil, 7 Mass. 261; Curtis v. Jackson, 13 Mass. 507. In Hammond v. Wadhams, 5 Mass. 353–355, the rule is thus stated by Parsons, C. J.:

"We may, and we ought to, grant a new trial when the verdict is against the evidence, or when it is manifestly against the weight of the evidence. In such cases the facts ought to be inquired into by another jury."

Where the evidence submitted to the jury is such as to render the issue doubtful, a new trial will not be granted, even though the verdict is against the apparent weight of the evidence. Brown v. Wilde, 12 Johns. 455; Stryker v. Bergen, 15 Wend. 491.

It is said in Tidd's Practice, in his chapter on New Trials, that:

"A new trial may be moved for on account of the error or mistake of the jury in finding a verdict without, or contrary to, evidence. But, where there is evidence on both sides, it is not usual to grant a new trial, unless the evidence for the prevailing party be very slight, and the judge declared himself dissatisfied with the verdict." 2 Tidd, Prac. pp. 907, 908.

If evidence be of so slight a character as to come within a reasonable definition of the scintilla rule, it is the duty of the court to direct a verdict, or, if it has submitted the matter to the jury, to set aside a verdict having no other support than a mere scintilla. In all such cases the evidence is insufficient in law.

The language of Justice Miller in Pleasants v. Fant, cited heretofore, has been used to justify the claim that there is no difference between the insufficiency of evidence to sustain the onus of proof which would justify a peremptory instruction to a jury, and that which will require the court to set aside a verdict as against the weight of the evidence; and yet we find in the language of Mr. Justice Swayne, in Schuchardt v. Allens, already cited, a statement that the rules which govern a court in granting a new trial because the verdict is against the weight of the evidence are quite different from those which determine the question for the court whether it shall deliver a peremptory instruction to the jury. An examination of the cases upon which the result was put, and of the issue there presented to the court, justifies the inference that what Mr. Justice Miller was arguing against was the absurdity of the scintilla rule, by which a case was submitted to the jury on mere 'surmises, and slight tendencies of evidence to establish a fact, when the court was fully advised that a verdict could not stand upon such evidence. The language which he used is to be taken as applying to the scintilla or evidence rule, and to the authoritative declaration by the court that such a rule was not to prevail in common-law trials in the federal courts. To give it any other construction must lead to a result at war with the language of Mr. Justice Swayne in Schuchardt v. Allens, already referred to, that the rules which prevail in the English courts, the decisions of which were relied upon by Mr. Justice Miller to sustain the view which the court took in Pleasants v. Fant, are in conflict with the considered opinion by the supreme court in which the very point now under consideration was presented to that court in the subsequent case of Railway Co. v. Moore, 121 U. S. 558, 7 Sup. Ct. 1334. In that case the question presented to the court was whether, under a statute governing the procedure in the supreme court of the District of Columbia, a motion for a new trial on the ground of insufficient evidence entitled the defendant against whom the verdict was rendered to bring from the special to the general term the ruling for examination upon a motion for a new trial on the ground that the verdict was against the weight of the evidence. The court held that the

term "insufficient evidence" included both evidence, insufficient in law and evidence insufficient in fact, and, therefore, that the supreme court of the District in general term had erred in not considering the motion for a new trial on the ground that the verdict was against the weight of the evidence. Mr. Justice Mathews considers the question as to what is meant by a motion for a new trial on the ground that the verdict is against the weight of the evidence. He says:

"So, upon the whole evidence in the case, the testimony in support of the cause of action or of the defenses may be so slight, although competent in law, or the preponderance against it may be so convincing, that a verdict may be plainly seen to be unreasonable and unjust. In many cases it might be the duty of the court to withdraw the case from the jury, or to direct a verdict in a particular way, and not in others. Where it would be proper to submit the case to the jury, it might become its duty to set aside the verdict and grant a new trial. That obligation, however, is the result of the conclusion of fact, and in such cases the ground of the ruling is that the verdict is not supported by sufficient evidence, because it is against the weight of the evidence. Therefore it was said by this court in Randall v. Railroad Co., 109 U. S. 478, 3 Sup. Ct. 322, 'It is the settled law of this court that when the evidence given at the trial, with all inferences that the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant.' In many cases, therefore, the evidence is insufficient in law, because insufficient in fact. It is true that motions to grant a new trial upon the ground that the verdict is against the weight of the evidence are, in a certain sense, addressed to the discretion of the court, and can be more satisfactorily dealt with by the judge who tried the cause, and who had the opportunity of seeing the witnesses and hearing them testify. And this furnishes one of the reasons why ordinarily a writ of error or an appeal will not lie for the purpose of revising and controlling the exercise of that discretion by an appellate tribunal; yet in some of the states a contrary practice prevails, and a writ of error is authorized to bring up for review the proceedings and judgment of an inferior court, on which it may be assigned as an error in law, upon a bill of exceptions setting forth the whole evidence, that the court below erred in not granting a new trial because the verdict was against the weight of the evidence. Such a practice in the appellate courts of the United States is perhaps forbidden by the seventh amendment to the constitution of the United States declaring that 'no fact tried by a jury shall be otherwise re-examined in any court of the United States than according to the rules of the common law.' But that rule is not applicable as between the special and general terms of the supreme court of the District of Columbia, as now organized. The appeal from the special to the general term is not an appeal from one court to another, but is simply a step in the progress of the cause during its pendency in the same court. The supreme court sitting at special term, and the supreme court sitting in the general term, though the judges may differ, is the same tribunal. It is quite true, nevertheless, that the judge sitting at special term on the trial of a cause by a jury is, from the nature of the case, better qualified, because he sees the witnesses and hears them testify, to judge whether the verdict is warranted by the evidence, than other judges, even of the same court, who are called in to decide the same question upon a report of the testimony in writing; and where the question comes up in general term, on an appeal, all proper allowance will be made, in its consideration, for that difference, and its due weight given to the order of the judge at special term denying the motion. The difficulty in the way of a satisfactory judgment on the appeal is therefore not to be considered as insuperable. In fact, it applies equally to the case of motions for a new trial based on the ground that the damages allowed by the verdict are excessive, which presents purely a question of fact, not determinable by any fixed and certain rule of law. It will apply also in many cases where the ground of the motion is that the verdict is not sustained

by evidence sufficient in law, for in one aspect that may involve questions of fact. That would be a proper form of motion in cases where, although there is some testimony to support the conclusion, it is so slight that the judge trying the case would be legally justified in instructing the jury to return a verdict the other way; and, although in such cases it is said to be a question of law, it nevertheless involves an estimate on the part of the court of the force and efficacy of the evidence. It is urged in argument, however, that the error did not prejudice the plaintiff in error, because the court necessarily passed upon the same matter in considering and sustaining the ruling of the court at the special term in refusing to instruct the jury to return a verdict in favor of the defendant upon the evidence offered by the plaintiff; but the question arising on this ruling, and that on the motion for a new trial at the conclusion of the whole evidence, were not identical. It might well be that on the plaintiff's evidence there was a case sufficiently made out to submit to the jury, while on the whole testimony it might fairly be a question whether the verdict was not against the weight of the evidence, in that sense which would justify the court in granting a new trial."

This recognition of the proposition that evidence may be so insufficient in fact as to be insufficient in law is further enforced in the late case of Railroad Co. v. Woodson, 134 U. S. 614, 10 Sup. Ct. 628, where the court had under consideration the constitutionality of a Tennessee statute (Code 1884, § 3835) providing that "not more than two new trials shall be granted to the same party at any action at law." This statute, at an early day, was construed by the supreme court as applicable only to new trials granted because the verdict was against evidence, and did not prevent any number of new trials for errors of law committed by the court, or misconduct of the jury, or the like. Trott v. West, 10 Yerg. 499; Turner v. Ross, 1 Humph. 16. In Woodson's Case it was urged that there was no evidence to support the verdict, and that the statute operating to prevent a new trial was obnoxious to the fourteenth amendment of the constitution of the United States, and worked an arbitrary deprivation of property without due process of law. The supreme court, upon a consideration of the decisions of the supreme court of Tennessee, construing the act, were of opinion that the statute was not to be construed as depriving the trial court of the power to grant any number of new trials, if in fact the verdict was unsupported by evidence sufficient in law to reasonably justify it. Upon this subject the court said:

"From these decisions it is clear that in Tennessee, as elsewhere, although the jury are the judges of the facts, yet the judge has power to set aside the verdict when, in his judgment, it is against the weight of the evidence, but that that supervisory power cannot be exercised under the statute when the triers of the facts have three times determined them the same way. This manifestly refers to a state of case where, in the opinion of the judge, the verdict should have been otherwise than as rendered, because of the insufficiency of the evidence to sustain it, but not to a case where there is no evidence at all. It is the settled law of this court that 'when the evidence given at the trial, with all inferences which the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant' (Randall v. Railroad Co., 109 U. S. 478, 482, 3 Sup. Ct. 322; Gunther v. Insurance Co., 134 U. S. 110, 10 Sup. Ct. 448), while, on the other hand, the case should be left to the jury unless the conclusion follows, as a matter of law, that no recovery can be had upon any view which can be properly taken of the facts the evidence tends to establish (Dunlap v. Railroad Co., 130 U. S. 649, 652, 9 Sup. Ct. 647). In

such case the practice of a demurrer to the evidence can be resorted to, or a motion to exclude the evidence from the jury, or to instruct them that the plaintiff cannot recover, which motions are in the nature of demurrers to evidence, though less technical, and have in many of the states superseded the ancient practice of a demurrer to evidence.    Parks v. Ross, 11 How. 362; Schuchardt v. Allens, 1 Wall. 359.    Such a motion, like the demurrer to evidence, admits, not only what the testimony proves, but what it tends to prove.    The ultimate facts, in other words, are admitted.   *   *   *   Tested by this rule, whenever the statute is applied it must be upon the assumption that although the court would have found a different verdict, because of the weakness of the evidence, yet there was some evidence tending to establish the cause of action.    Courts rarely grant a new trial after two verdicts upon the facts in favor of the same party, except for error of law; and the statute, in the interest of the termination of litigation, makes that imperative which would otherwise be discretionary.    For decisions under similar statutory provisions, see Silsbe v. Lucas, 53 Ill. 479; Railroad Co. v. Patterson, 93 Ill. 290; Carmichael v. Geary, 27 Ind. 362; Boyce v. Smith, 16 Mo. 317; Wildy v. Bonney's Lessee, 35 Miss. 77; Rains v. Hood, 23 Tex. 555; Watterson v. Moore, 23 W. Va. 404.    We can perceive nothing in the statute thus applied which amounts to an arbitrary deprivation of the rights of the citizen, and concur with the . supreme court of Tennessee that this act, which had been in force for more than sixty years before the adoption of the fourteenth amendment, was not invalidated by it, while the fifth amendment had no application whatever. The statement in the judgment of affirmance is that 'the court adjudges that there is no evidence to support the verdict of the jury,' and, if this were taken literally, it would follow that no recovery could be had, as matter of law; and we therefore suppose that the language used indicates simply the opinion of the court that the jury ought not to have found the verdict that they did, and that the judgment of the court below, refusing to grant a new trial upon the facts, would have been reversed, but for the existence of the statute, which made it error to award it.  Iron Co. v. Dobson, 15 Lea, 409, 418." Railroad Co. v. Woodson, 134 U. S. 620, 621, 623, 624, 10 Sup. Ct. 628.

Subsequently the supreme court of Tennessee had the meaning of the same statute under consideration in the case of Railway Co. v. Mahoney, 89 Tenn. 311–333, 15 S. W. 652, where, after reviewing the Tennessee cases distinguishing the power of the trial judge in awarding new trials upon the evidence, and the circumstances under which his exercise of that power might be reviewed upon a writ of error, it said, touching the meaning of this statute, that:

"But while it was the duty of the circuit judge, upon a view of the evidence conflicting with that of the jury, to set the verdict aside, it is obvious that if there was no limit upon this power no verdict would ever stand, and of necessity there must be some way to end the case, notwithstanding such conflict of opinion.    This act was intended to settle it, and, in favor of the correctness of the conclusions of the three juries, to give to the verdict of the third, upon evidence which in any proper aspect would sustain it, such weight that it could not be disturbed, because different from that which the judge would have deemed proper and approved on the weight of the evidence.    The question of difference in opinion had to be provided for and settled in some way. This is perhaps the best and least objectionable in which it could have been done.    At all events, it was within legislative power, and violated no provision of the constitution, state or federal."

It seems to us to follow, from both reason and authority, that there is a difference between the legal discretion of the court to set aside a verdict as against the weight of evidence, and that obligation which the court has to withdraw a case from the jury, or direct a verdict, for insufficiency of evidence.    In the latter case it must be so insufficient in fact as to be insufficient in law; in the former case

it is merely insufficient in fact, and it may be either insufficient in law, or may have more weight, and not enough to justify the court, in exercising the control which the law gives it to prevent unjust verdicts, to allow a verdict to stand.    Randall v. Railroad Co., heretofore cited, and the long line of cases in which it has been affirmed, profess to stand upon the English cases which we have cited, and particularly upon Ryder v. Wombwell, L. R. 4 Exch. 32–39.    In that and other cases cited, and notably in the leading case of Railway Co. v. Slattery, 3 App. Cas. 1155, it appears that cases were constantly presented in which the court say a verdict should have been set aside as against the weight of evidence where the court would not be justifiable in directing a verdict.    We do not think, therefore, that it is a proper test of whether the court should direct a verdict, that the court, on weighing the evidence, would, upon motion, grant a new trial.    A judge might, under some circumstances, grant one new trial and refuse a second, or grant a second and refuse a third. In passing upon such motions he is necessarily required to weigh the evidence, that he may determine whether the verdict was one which might reasonably have been reached.    But, in passing upon a motion to direct a verdict, his functions are altogether different.    In the latter case we think he cannot properly undertake to weigh the evidence.    His duty is to take that view of the evidence most favorable to the party against whom it is moved to direct a verdict, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not, under the law, a verdict might be found for the party having the onus.    If not, he should, upon the ground that the evidence is insufficient in law, direct a verdict against that party.    That there is a mere scintilla of evidence is not enough to prevent the withdrawal of the case from the jury.    Such evidence is insufficient in law, because so insufficient in fact.    It is impossible, in the very nature of the subject, to lay down a hard and fast rule by which a trial judge may determine when the evidence is of greater weight than to be regarded as a mere scintilla.    We only wish to be understood as holding that whenever there is evidence of so positive and significant a character as, if uncontradicted, would support a verdict, it is the duty of the court to submit the case to the jury, under proper instructions.    It is certainly not his function to weigh the evidence for the purpose of saying how the verdict should go.

We have deemed it important, before considering the facts of this case, to clearly state the rule which must be applied as a test of alleged error where an assignment of this character is under consideration.    If it shall appear that there was something more than a mere scintilla of evidence tending to show legal negligence upon the part of the plaintiff in error,—evidence so material and substantial as that, if uncontradicted, it would in law justify a finding of negligence,—then the assignment is bad, and the action of the trial court in refusing to direct a verdict must be approved.    In support of this motion it is argued that the evidence was—First, that the car was traveling at a speed of about eight miles per hour, and up a grade of about five feet to the hundred;

second, that the wagon was going down the avenue, on the western or down track, at a speed of about five miles per hour; third, that there was no indication of danger until the horses turned off the western track, and onto the eastern track; fourth, that the car was stopped by the gripman as soon as it was possible to do so after the horses in the ice wagon turned onto the track upon which the car was moving. The car upon which Mr. Lowery was riding was going out from the city to Walnut Hills. The collision occurred at a point on Gilbert avenue where the grade was steep, and where there were two tracks side by side. The most western of these tracks was used by cars going down into the city; the other, by cars going out from the city. These tracks were not more than from two to three feet apart. At the time of this collision, and for some weeks theretofore, the western half of the street, at the locus in quo, had been undergoing repairs, and to prevent its use a barricade had been erected parallel with the western track for about 1,000 feet. This barricade stood very close to the west rail of the western track, and consisted of barrels placed at intervals, with boards extending from one to the other. Near where the collision occurred a lighted red lantern stood on one of the barrels of the barricade. The collision occurred between 5 and 6 o'clock in the afternoon of a late October day. It was about dusk, and the car lamps had been lighted. The wagon with which the car collided was, as before stated, going down the avenue, upon the track immediately next to the barricade. It was a large, covered, heavy ice wagon, drawn by two heavy draft horses. The question as to whether the gripman was guilty of any negligence in failing to avoid this collision is within very narrow quarters. The utmost speed of the cable was eight miles per hour, which is about eleven feet per second. If the grip had fast hold of this cable, that was necessarily the speed of the car when the gripman undertook to stop it. That this was in fact the speed of the car at the time was one of the uncontroverted facts of the case. To travel at a less rate of speed, it was necessary to so loosen the grip that the cable would slip through. This produced much friction, and wore the cable very rapidly. It was therefore objectionable that the car should travel at a less rate of speed than the utmost speed of the cable. By taking the grip entirely off the cable, the car would lose motion altogether. It is not contended that there was any evidence that the gripman undertook to check this utmost speed of his car until the horses of the ice wagon were actually upon the track. The plaintiff below contended that there were indications of danger from a collision before the horses turned upon the eastern track, and that the high degree of care due from such a common carrier to its passengers required such vigilance as would have discovered these indications, and induced the exercise of precautions against the danger of a sudden swerving of these horses, which might result in a collision. In support of this view the jury specially found that there were indications of danger when this wagon was about 65 feet from the car. The plaintiff below also contended that, if the gripman had thrown off his grip

and applied his brake immediately after the horses and the ice wagon appeared upon his track, the car could have been stopped and the collision averted.  There was in the judgment of the trial judge such conflict of evidence touching these contentions as to justify a submission of the question of negligence to the jury.  As we have before intimated, the question was a close one.  There was no evidence whatever of anything like recklessness or heed- lessness on the part of the gripman.  If he was at fault at all, it was that he did not act with sufficient promptness after the horses became an obstruction upon his track, or that he did not take precaution to check his car before the horses got on his track. The machinery for stopping the car was in order, and with one movement of one hand his grip could have been thrown off, and by a simultaneous movement of the other his brake could have been applied.  So well adapted were these appliances for stopping the car, that the gripman admits that he could have stopped and did stop his car within six feet after he endeavored to stop it.  A com- mon carrier of passengers by street car is required to exercise the highest degree of skill and care.  The driver, whether of horses or machinery, should be vigilant in observing his track, and prompt in the exercise of every reasonable precaution to guard against ac- cident.  If the street traveled is one much incumbered by other vehicles, the danger of collision is correspondingly increased.  The west side of the street at the point of this collsion was temporarily obstructed, and the street thus traveled narrowed by the improve- ment which we have mentioned.  A wagon or other vehicle driv- ing on the western track could not turn out, if it should become nec- essary to permit passage of a car on that track, except by going on or across the eastern track.  The presence of this barricade made it also inevitable that, if horses driven along this western track should frighten at the barricade or the lantern thereon, they would jump or swerve over onto the eastern track.  An increase of vigi- lance was therefore due from gripmen when passing this narrowed part of the street, both by reason of its narrowness, and of the possi- ble effect of the barricade and red lantern in frightening horses. Upon this subject of the vigilance required from the gripman of such a car, the charge of the court was a full and sound exposition of the law applicable to the circumstances of this case.  It was the duty of the gripman to be on the lookout.  If it be assumed that there was nothing in the action of the horses or the driver of this wagon indicative that the horses were not under control, nor anything else in the situation which should have put the gripman on his guard before the horses left the west track and appeared upon the east track, then the sole question would be whether the gripman saw the horses as soon as they turned upon his track, and at once did every possible thing to stop his car.  The evidence of the gripman as to when he first saw this ice wagon, was this:

"I was going up Gilbert avenue, when I saw just, while I was passing along. a car coming down on the west track.  Q. Which track were you on?  A. I was on the east track, going north.  I saw a team of horses turn out from behind the car that I saw coming.  I don't think there was more than twenty

feet in front of the car. It seemed to be going very fast. I was standing a hold of the gong with my right hand, and gripping the lever with my left hand; and the very instant I saw the horses come in sight I rang the bell, and released the cable, and applied the brake, just as quick as I could, and stopped the car as near instantly as I could."

After stating that his car was moving full speed of the cable, eight miles per hour, he was asked this question:

"Q. In how short a space can you stop a car under conditions like this; that is, as to grade and number of passengers? A. Within six feet. I am satisfied that that car did not run over six feet from the time I saw the team until it was standing still."

Upon cross-examination he stated that he had been looking forward all the time, and that he did not see the wagon until it was within 20 feet. He was asked:

"Q. If you were looking forward all that time, how was it you did not see it when it was fifty feet? A. Because it didn't come in sight before it got that close to me. Q. What was the distance between the down car and the wagon, according to your estimate? A. I don't know. Didn't see how close,— the space he come out from behind this car. I don't think it was over ten feet behind the car that he was following down. Whether he was following right down behind that car, or whether on or over further, I don't know, but when it came out in my sight it was about ten feet behind the car it was following down. Q. And about twenty feet away from your car? A. Yes, sir; that is, from the front of my car."

Later this witness said:

"The stop I made, if the man driving the team would have went ahead as he had his horses pulled to go, there would have been no accident whatever. The team was going angling across the track, twenty feet from my car, I should judge,—anyhow, twenty feet,—and I stopped my car within six feet, I am satisfied; and if he had never went on ahead, across the track, the car never would have come up to the wagon. Instead of that, he pulled to go down in front of me again, and run right into my car. Q. Did his horses turn suddenly? A. What do you mean,—when he came out in the track, or when he turned them off? Q. When they entered the track, as you say? A. Just came right out behind the other car. Q. Do you know what made them turn out? A. No, sir. Q. Then you didn't see what the driver did? A. I don't know whether he pulled so as to come out or not. I seen him pull back. Q. All you saw, and you are sure you saw, is that he pulled the horses back? A. I am sure I saw him pull back. Q. Now, your idea is that it would have been better if he had pulled the horses to the east side of the track, rather than into the west? A. Wouldn't have to pull if he had let them go the way they were going. Q. Wouldn't there have been a collision if he had pulled on the other side? A. No, sir; he would have been far enough then to run across the track. Q. Do you mean to say that your car was standing still before he reached you? A. I mean to say that my car was stopped when the ice wagon hit it. Q. You know it was at a dead still? A. I know it was a dead still when the wagon hit the car. Q. You are sure of that? A. I am sure of that."

It is clear that this witness is to be understood as testifying that he did not see this wagon until the horses turned on his track, and that he did not see it sooner because it was following close behind a car going in the opposite direction. It is also clear that he means to say that his car did not move more than six feet after he first saw the horses turn on his track, and that the wagon ran into his car after it had been stopped. One hypothesis of the plaintiff below was that this heavy wagon was coming down past this barricade at such a dangerous speed as to indicate to a prudent, watchful grip-

man that it would be unsafe to pass it unless his own speed was so checked as to enable him to stop his car instantly if for any reason it should endeavor to cross his track, or the horses should swerve or bolt from the narrow way upon which they were being driven.    The jury, as we have stated above, specially found that there were such indications before the ice wagon turned in upon the eastern track. The gripman's evidence tended to utterly overthrow this theory and the conclusion reached by the jury.    If the wagon was following so closely behind this passing car as that it could not be seen, in the dusk of the evening, until the horses actually turned onto the eastern track, the gripman would be guilty of no negligence in not seeing what, under the circumstances, could not be seen.    Another contention of the plaintiff below was that the gripman did not stop this car as soon as he might have done after the danger became apparent and extreme.    But this view was seriously affected if it was true that he stopped the car so quickly that it was at a standstill when the pole of the wagon crashed through the fender or shield on the front of the grip car.    Upon both of these important facts there was a conflict of evidence.    This conflict is perhaps more sharply illustrated by contrasting the evidence of Campbell, the driver of the wagon, with the evidence of the gripman.    Campbell says that when the collision occurred the car, behind which he was driving, was at least two blocks ahead of him.    Of course, if this is credited, that car was not an obstacle which prevented the gripman from seeing the wagon and observing its speed, or anything else which ought to have put him on his guard.    When asked to state just how the collision occurred, this witness said:

"A. Well, we came down to where the blockade was, across the street, with the red light on it. I got pretty close to that, and the team shied off. A car was coming right straight agin me, and I tried to keep away from them, but I couldn't make it; and the pole struck the car, and I hollered to the gripman to stop it. The car was coming on at a lively gait. I held my team back as much as I could, and pulled them around a little. Then the pole struck the car. The team had come around a little with it—with the car—before it got stopped. Q. Was that car standing still when your wagon struck it? A. No, sir. Q. How was it running when the wagon struck it? A. Coming fast. Q. Did you observe the speed of the car? Did it slow up any between the time your horses frightened and the time the wagon and car struck? A. No, sir."

There was also a conflict as to just how close the car was when the horses turned onto its track.    The gripman thought they jumped onto his track only 20 feet ahead of it.    One witness for the plaintiff put it at 36 feet.    On all the evidence, the car could have been stopped within 6 feet.    This difference becomes a matter of some importance, in determining whether the movements of the gripman, even after the danger became imminent, were as prompt as the exigency demanded, and as they might have been if he had exercised the utmost skill and diligence.    So there was a conflict as to the apparent speed at which this wagon was approaching.    The weight of the evidence undoubtedly tended to show that the horses were not running, but trotting, and that their speed was about five miles per hour.    But there was both positive and circumstantial evidence in-

dicating a much greater speed.    Daniel Metz, one of the plaintiff's witnesses, a passenger sitting on the grip car, testified that the horses were coming very fast, and were running.    In answer to a question as to their rate of speed, he said, "I should judge, about ten to fifteen miles per hour."    On cross-examination the witness reiterated his statement that the ice-wagon horses were not trotting, and said they "were coming on a full run," and that "he judged or guessed that their speed was from ten to fifteen miles per hour." Without going further into details, it is evident from the evidence already referred to that there was conflicting evidence of a character not to be regarded as so slight or uncertain as to come within the scintilla rule.    The weight of the evidence may have been against the finding, but, as the court refused a new trial upon that ground, we are not authorized to do more than ascertain whether there was evidence sufficient in law to have supported the verdict, if it had been uncontradicted.    The evidence to which we have referred made a conflict in regard to the distance this car was from the ice wagon when it actually appeared upon the track upon which the collision occurred.    It also shows that there was a conflict as to when the gripman ought to have seen the wagon coming down the western track, and as to the speed, real or apparent, at which it was approaching.    The special finding that the speed of the wagon was five miles per hour does not authorize us, in considering whether the court ought to have directed a verdict, to accept that finding as if based on undisputed evidence.    We must look at the facts as the trial judge was required to look at them.    This special finding does rest upon the weight of the evidence, but it is of no importance in the determination of the question now being considered.    Neither are we prepared to say that, as matter of law, the points upon which there was a conflict were immaterial.    If the jury had taken the view of the evidence most favorable to the plaintiff below, we cannot say that a verdict finding that the plaintiff in error had fallen short of the degree of prudence and care due from it to a passenger would be unsupported by sufficient legal evidence.

The third error assigned is that the court erred in refusing to give the following special charge requested by this defendant:

"If you find that the horses suddenly turned when within about twenty feet of the car, and that this was the first indication of danger, and that the gripman at that instant saw the horses turn, it is immaterial whether or not he discovered the wagon coming down the hill up to this time."

The fourth error may be considered with the third, and is in these words:

"The court erred in giving the following charge, being a modification of the foregoing special charge requested by this defendant: 'Now, I cannot give that to you in the language of the instruction.    I say this:  That, if there was anything in the speed of the wagon as it was coming down the hill from above, it was the duty of the gripman to observe it.    If there was not, and the wagon was so far away that there was not any ground of apprehension of a collision, then he was not bound to slacken the speed of his car; and in that sense, if you find that the horses suddenly turned when within about twenty feet of the car, and that this was the first indication of danger, the charge is right.    If there was not anything unusual in the appearance of the horses and wagon as they came down above that, it would be immaterial whether he

discovered them before that time or not; but it was the gripman's duty to have his eyes not merely on what was before his car, but what was within his sight. Suppose there had been a pair of runaway horses attached to a wagon coming down Gilbert avenue; no one could undertake to say that the gripman was not at fault if he failed to discover that runaway team until it got within twenty feet of the car. Everybody could recognize that·it was the duty of the gripman to govern his actions accordingly. If there was not anything unusual in the appearance of the team coming down the hill, then he was not bound to stop the car until he got within a danger distance. If there was, it was necessary for him to take all precautions which the situation indicated.' "

From what we have already said, we must overrule these assignments. The modification was proper, under the facts of this case; and the request, as modified, is a clear and sound exposition of the law as applicable to this case. This disposes of all the points urged for a new trial. The result is that the judgment must be affirmed.