## VANY v. PEIRCE.

(Circuit Court of Appeals, Sixth Circuit. July 6, 1897.)

### No. 356.

1. TRIAL—DIRECTING VERDICT FOR DEFENDANT.

A court should not direct a verdict for defendant where plaintiff's evidence, if standing alone, would sustain a verdict in his favor, although on the whole case the evidence for defendant greatly preponderates.

2. MASTER AND SERVANT—PERSONAL INJURY—CONTRIBUTORY NEGLIGENCE.

A brakeman cannot recover for injuries received, while coupling two Pennsylvania freight cars, by being caught between the projecting deadwoods with which such cars are constructed, on the alleged ground that it was dark, and the oil furnished him for his lantern was of such poor quality that he was unable to see that the car he was approaching was a Pennsylvania car, when it appears from his own testimony that he must have known that the moving car was a Pennsylvania car, and that he could see the drawhead of the standing car as he approached, and that the coupling pin was in proper position, but that he did not notice the kind of car it was.

In Error to the Circuit Court of the United States for the Western Division of the Northern District of Ohio.

This is a writ of error to review a judgment of the circuit court of the United States for the Western division of the Northern district of Ohio. The plaintiff on the 9th of October, and prior thereto, was employed as a brakeman by Samuel R. Calloway, receiver of the Toledo, St. Louis & Kansas City Railway Company, appointed by the circuit court of the United States for the Northern district of Ohio. The plaintiff was injured while in such employment, and brought suit in the common pleas court of Lucas county against Calloway as receiver. The suit was removed to the circuit court of the United States on the ground that the cause arose under the laws of the United States. After the removal, Calloway was succeeded by R. B. F. Peirce as receiver of the railroad company, the defendant in error here. Peirce answered the petition of the plaintiff. The case of the plaintiff, as stated in the petition, was as follows:

"For a long time prior to the 9th day of October, 1893, plaintiff says he was employed by the said Samuel R. Calloway, receiver as aforesaid, in the capacity of brakeman upon a local freight train on the said road running between the city of Toledo and the village of Delphos, Ohio, a station on the line of said road. As such brakeman, it was his duty, among other things, to go between the freight cars in said train for the purpose of coupling and uncoupling the same. It was the further duty of said receiver to furnish plaintiff with a lantern, and supply the same with oil of a good quality to be burned in said lantern. Said lantern and the light furnished thereby were necessary in the night season to enable plaintiff to perform his work in a good and proper manner, and to afford him the means of guarding against injuries to his life and limbs while in the performance of his duties. At about the hour of 7:30 o'clock, standard time, in the evening of said day, and while it was dark, the plaintiff was ordered by the conductor in charge of said train to couple several freight cars attached to the engine which drew said train to the balance of said train consisting of about 40 cars, which last-named cars were standing on the track of the said railroad, a short distance east of said engine, at or near a place known as 'Cloverdale,' a station upon the line of said railroad in Putnam county, Ohio. Plaintiff further says that in compliance with said order he gave a signal to the engineer of said engine to back the said first-named cars for the purpose of being coupled to the balance of the freight train as aforesaid; that said engineer did thereupon cause said cars to be backed; while the plaintiff swung a lantern for the purpose of giving

signals to said engineer, which said lantern had been furnished to him by the said receiver, and said cars so being backed approached said cars so standing upon said track. Plaintiff, on account of the darkness which then prevailed, held up said lantern immediately after swinging the same to signal said engineer, in order to see the condition of the cars he was about to couple. But said lantern failed to emit sufficient light to enable him to see the kind of car, and appliances thereon, that was standing still, attached to the main part of said train. Plaintiff further says that the immediate cause of the light being poor and insufficient to afford the necessary light for plaintiff to see while in the performance of his said work was because the said receiver had wrongfully, carelessly, and negligently failed to furnish him with a lantern containing oil of good quality, but did furnish him with a lantern which contained oil of a poor, cheap, and inferior quality, by reason of which the light in said lantern became nearly extinguished just after the swinging of said lantern, and failed to give sufficient light, as it should have done, for plaintiff to see the condition of the cars which were to be coupled together, and the distance between them. By reason of the failure of said lantern to furnish light as aforesaid, and while plaintiff was performing his duty, the said cars which were being backed were run against the said cars standing upon such track in such manner as to catch plaintiff's body between the framework of the cars being coupled, which said cars were of the kind known as 'Pennsylvania cars,' having sills projecting at each end beyond the car's main body; and, by reason of being caught in said projecting frames of said Pennsylvania cars, the plaintiff was squeezed between said cars, and fell upon said track in such manner that his right leg remained upon one of the rails of said track, and the wheels of the said car which was furthest from the engine, and being backed as aforesaid, ran upon and over the plaintiff's said right leg at a point near the knee, crushing, mashing, and mangling the same."

The answer of Peirce denied that Calloway, the receiver, was guilty of any negligence which caused the injuries received by plaintiff, and averred that the plaintiff was injured through his own fault and negligence.

The plaintiff adduced much evidence to show that the oil furnished by the receiver to his employés at the time of the accident was defective, and that complaints concerning it had been made known to the superior officers working under the receiver. The receiver's evidence tended to show that the oil was as good as any signal oil used by the railroad companies of the country. The learned judge at the circuit court at the close of the evidence examined the question of what his power was with reference to granting a motion to direct a verdict for the defendant on the ground that the evidence with respect to the defective quality of the oil was not sufficient to support a verdict. After referring to a decision by the supreme court, he stated his conclusions as follows: "Now, I have very fully stated the evidence in that case, to show that the trial judge must not only have determined where the preponderance of the evidence was, but must have considered the evidence tending to show negligence, and that he must have determined that the evidence was of such a character that, if a verdict had been returned for the plaintiff, it would have been his duty to set it aside. In reaching that conclusion, he must necessarily have weighed the evidence, and considered all the testimony given on the trial, the credibility of the witnesses, and all the circumstances, and from them all determined whether there was such a sufficiency of testimony as would have supported a verdict, if rendered. So that I understand the rule to be in the federal courts that at the close of the evidence it is a right which the defendant has to challenge the array of facts by having the trial judge determine whether or not there is sufficient evidence to authorize the case to be submitted to the jury, and that is a legal right, which the defendant is entitled to, and that it is the duty of the judge of the court to pass upon that question, and determine whether or not there is such a sufficiency of testimony to sustain a verdict for the plaintiff, and, if not, to direct a verdict for the defendant. Now, I am aware that there are some decisions of the courts of appeals in some circuits where there is an attempt made to modify this rule. But these two decisions I have cited stand. They never have been modified, never been reversed, never been qualified in any way. So there can be no mistake about the rule. It therefore remains my duty to determine whether or not in this case there is sufficient evidence to support a verdict, so that if this case was submitted to this jury upon

this evidence, and they returned a verdict, it would not be the duty of the court to set that verdict aside."

The ju__ ^e then proceeded to consider the evidence, and finding by the great weight of the testimony that good oil was furnished, and that it had not been impaired after it came into the possession of the company, and that, if a verdict were to be rendered for plaintiff, the court would set aside the verdict as against the weight of the evidence, he directed a verdict for the defendant.

It was admitted in the case that, on the freight cars of the Pennsylvania Company, sills extended from the end of the car outward just over the drawbar where the coupling is made, and that, in making a coupling between such cars, it was necessary for the brakeman to stoop down and put his hand up from below under the sills, and above the coupling, to avoid being squeezed by the sills. The evidence of the plaintiff as to how the accident happened may be seen from the following quotations of his evidence:

"Q. Now tell the jury how it happened that you received your injury at Cloverdale. Just go on, and, in your own words, detail the circumstances to the jury. A. Well, I got caught between those end sills, making the coupling,—caught there and mashed when the slack run up at the hind end. Then I dropped— * * * Q. Now tell the jury what the circumstances were connected with your coupling,—how you went at it. A. I was walking along the track, fixing the link, and I walked along until I got close up to the other car, had my link fixed, swung my lantern— Q. Did you go in on the track to fix the link? A. Yes, sir. Q. In which car? A. In the car that was backing up. * * * Q. Tell how the light was. I mean, was it daylight or darkness at that time? A. It was dark at that time. Q. How dark was it? A. Well, it was so dark that you could not see, without a light, to do any work. Q. Did you have any lantern? A. Yes, sir; I had a lantern. * * * Q. Tell the jury what you did when you were at the work of making the coupling in the use of the lantern,—what use, if any, you made of the lantern. A. I swung it out for them to slow up. Q. You was between the cars. How did you swing it? A. I swung it out by the corner, past the corner, and I went to make the coupling,—held my lantern up. I lifted it up to make the coupling. Q. Lifted it up in front of you? A. Yes, sir; when I raised my lantern up the light went down, so you could see nothing by it. Q. What took place then? A. I got caught between these two deadwoods or sills. Q. What was the cause of your being caught? A. Well, on account of I did not have any light to see what kind of cars they were. Q. What kind of cars were those between which you were caught? A. They were Pennsylvania cars, both of them. Q. Describe them. A. Well, one of them was a refrigerator car. The other was just a common box car. Q. How are those cars constructed? A. They have a sill—oh, perhaps, a foot thick—that runs out past the end of the car. Each one of them had this sill. Q. These sills extend out beyond the end of the car? A. Yes, sir. Q. Did they extend a foot wide clear across the end? A. They are not quite so wide. They kind of narrow off a little at the end. Q. Is this construction peculiar to Pennsylvania cars? A. Yes, sir; they are all that way, I think. Q. That construction—this wide projection the whole width of the end of the car—is made for what purpose? A. For end brakes. Q. To allow a man to stand between the cars and twist the brakes? A. Yes, sir. Q. And those cars the brake is on the end instead of on top? A. On the end of the car. Q. Now, what is the fact with reference to the space between these projecting sills on these Pennsylvania cars? A. Well, I should think, up towards the middle, they would not be more than four or five inches. Q. The space gradually widens out from the center? A. Yes, sir. Q. How are the couplings made on these cars,—this kind of cars,—ordinarily? A. Well, they are mostly made by stooping down and making them from the bottom. * * * Q. You were standing sideways towards the car? A. Yes, sir. Q. Your arms and body crosswise on the track? A. Yes, sir. Q. Your back was towards the car that was backing up? A. Yes, sir. Q. Was you walking along with it? A. I had been in the center of the track, fixing the link. * * * Q. What took place after you was caught by the car and squeezed? A. Well, the slack run out and let me drop down. My body and all fell out, but one leg that was across the track. Q. What took place then? A. They run over it. Two trucks, two wheels, run over it. Q. How much light did the lantern give after you had swung it in there making the coupling? A. It did not give any. I could hardly see it. Q.

Did it go clear out, or not? A. I do not know whether it went clear out, or not. I could not tell. Q. Were you able to see the kind of cars that were coming together? A. No, sir. Q. You swung the lantern out how long before you was caught and squeezed? A. Yes, sir. Q. How long before you was caught and squeezed,—immediately? A. Just a little bit before. They were backing up. I swung the lantern across the track for them to stop."

On cross-examination the plaintiff testified that he had given the signal to the engineer to back down to make the coupling after having kicked a flat car onto the side track. The counsel then put the question:

"Q. There was nothing the matter with the lantern, so far as you could see, at that time? A. Nothing, only it burned a little dim once in a while. Q. How soon after you got the lantern did you notice it burned dim? A. I did not use it only about ten minutes. Q. How soon after you got it did you notice it burned dim? A. Just about the time I was making the coupling. Q. Then the lantern burned all right when you got it? A. Yes, sir. Q. It burned all right when you gave the signal to the engineer to back down? A. It would kind of die out when you would swing it. Q. How soon did you notice that it would die down when you would swing it? A. I did not notice it until I swung it out for them to stop. Q. Then it worked all right when you gave them the signal to back up, didn't it? A. Well, I would not say for that, because I hardly ever looked at my lamp. Q. From the fact that you did not notice anything wrong, does not that satisfy you that it worked all right? A. I think the conductor gave the signal to back down. Q. Didn't you give the signal? A. I do not think I did. * * * Q. You could see up on the switch, couldn't you? A. I could see enough to throw the switch. Q. You could see to uncouple the flat car? A. Didn't have to see much to do that. Q. You could see enough to do that,—is it not a fact you could see enough to do that? A. Well, it was not so awful dark. A man could see to do that without a lantern,—to pull a pin. Q. How long was it between the time you uncoupled the flat car on the switch to the time you attempted to make the coupling on the side track to couple up the train? A. About fifteen minutes. Q. It took you fifteen minutes from the time you went down there to go down and make this coupling, did it? A. Yes, sir: it was all of fifteen minutes. Q. And you could see, couldn't you, to throw the switch and lock the switch? A. A man could see that without any light. Q. You could see to arrange the pin on that refrigerator car you were walking in front of? A. I could see the link and pin. It was fast in the drawbar head. I had to loosen it. Q. You could see that drawbar head? A. Yes, sir. Q. And the link and pin? A. Yes, sir. Q. Your lantern gave light enough for that, did it? A. You could almost do that in the dark, without any light. Q. You could do that with your eyes shut? A. Almost; yes, sir. Q. Well, now the truth is, Mr. Vany, you did not look at that very carefully,—you did not think it very necessary,—did you? A. I fixed it. I loosened it. Q. You did that without paying much attention, didn't you? A. Sure, it had to be done, or you could not make the coupling. Q. You did that without looking at it very carefully? A. I seen it was all right. Q. Your lantern gave light enough to enable you to see that? A. You could tell that without looking much. * * * I done it without looking. I just walked along there, and looked where I was walking, and stopped and took the pin and loosened it. * * * Q. Well, now, as you went in between the cars there, where were you when you went behind the refrigerator car, that was backing down to arrange the link and pin,—how far up the track? A. I was four or five car lengths from the hind cut, standing still. Q. Was you walking all of that distance on the track in front of that car? A. Most all the way. Could not fix it either when it was backing up. Q. How far were you from the hind cut of that train that was standing still when you gave the signal to stop? A. I was just about to the cut. I walked on ahead of the car backing up after I fixed the link. Q. That is, you walked faster than the engine moved? A. Yes, sir; they were going slow. Q. You walked faster than the engine moved, went up, and stood at the stationary car, and waited for them to back down? A. I walked up to about four or five feet of it. Q. You walked up to within four or five feet of the stationary cars, and waited for the moving train to come down? A. Yes, sir; the train was not very far back of me. It was moving right along. Q. But you moved faster than the train behind you did,—you moved faster than the train did,—and went up to the stationary cars? A. No, sir; I did not go up to

them. Q. I mean within four or five feet of them? A. They were only three or four feet from me when I stopped. Q. You went up to within three or four feet of the stationary cars, stopped, and waited for the moving train to come down, did you? A. I stepped on between the track. Q. That is, outside of the rail? A. Yes, sir. Q. Did you examine this car to see what the condition of the coupler was? A. No, sir. Q. You did not look at that at all? A. No, sir. Q. Did you stand with your back towards the stationary cars, or towards the moving train? A. Towards the moving train. Q. With your back towards the moving train? A. Yes, sir. Q. Then as you stood there, waiting for that train to come down, you stood with your face towards these stationary cars,—you did not look to see what condition the coupler was in? A. I was outside. Q. You did not look to see, did you? A. Well, I seen the link and pin was set in the drawbar head. Q. You could see that, could you? A. Yes, sir. Q. You mean, by 'the pin was set,' that the pin was set up in the top hole in the coupler, ready to receive the link? A. Yes, sir. Q. You could see that, could you? A. Yes, sir. Q. So there was nothing else for you to do? A. To make the coupling. Q. Until the train come up to that stationary car, you did no work; it was all right? A. There was no work to do. Q. Could you see that this was a Pennsylvania car? A. You could not tell well. Q. Could you see these bumpers—deadwoods, as they are called—on that car? A. You could if you would walk up and notice. Standing in front, I do not suppose you could tell. Q. You were outside? A. Yes, sir; off on one side. Q. Do you mean you could see this coupling pin? A. I could see that walking along. Q. It was light enough for you to see that as you walked along the track? A. My lantern gave light enough to walk by. Q. Your lantern gave light enough to enable you to see that as you walked along the track, did it? A. I do not know whether I seen it, or whether I walked up to the car. I think, though, that— I think I walked up to the car,—up to the drawbar. Q. You walked up to the drawbar of the stationary car? A. I am not sure. It has been so long I have almost forgotten. Q. What is your best recollection now as to whether you did walk up to that stationary car? A. Well, I could not say. Q. Well, did you see the coupling pin standing in the head of the drawbar, ready to make the coupling? You did see that, didn't you? A. I said I seen it, but I could not say whether I did or not. It has been so long ago I have forgotten the most of it. Q. You saw it, didn't you? A. I said I saw it. Q. You are telling the truth, are you not? A. I am supposed to. A man can't remember so long as that. Q. Will you tell the jury why, if you could see that coupling pin, that you could not see these deadwoods you spoke of, which are perhaps eight or ten times as large? A. Those kind of cars are something we had not been in the habit of using or hauling many of them,—would not pay any attention to it, would not notice them. Q. Because they were unusual, you would not pay any attention to them? A. You would not just think of it. Q. Don't you know, Mr. Vany, that is just the contrary? When you get an unusual car, you do pay attention to it. That is a thing that attracts your attention. A. Not so far as making couplings. Q. If you had a strange car, the like of which you had never seen before, you would not pay any attention to that? A. I suppose a man would pay attention to it. Q. Now, this deadwood as it is called, on the Pennsylvania cars, is a large timber structure out above the drawbar? A. I think it is right over the top of the drawbar. Q. It is a large timber? A. Yes, sir. Q. How long is it on each side of the drawbar? A. The full length of the car. Q. How thick is it? A. I could not say. Q. About how thick? A. I could not say. Q. Six, eight, or ten inches? A. Which way do you mean? Q. How deep? A. I do not know just how wide it is. Q. It is a large timber? A. Yes, sir; it is a square piece of timber. Q. It is at least as large as the drawbar, is it not? A. It is as large as the drawbar if it was doubled up. * * *"

Again on cross-examination the plaintiff was asked:

"Q. You swore that the lantern gave so little light you could not see what kind of a car it was? A. I did not notice what kind of a car it was. Q. Then it was not that the lantern gave so little light you could not see, but that you did not notice? You could not see what kind of a car it was, but that you did not notice? A. You could not see what kind of a car it was from the end, I suppose, unless you took a little time to notice it. * * * Q. Did the lantern give you sufficient light to enable you to see the appliances on this car if you had gone up to it and looked? A. Might have took time to raise it up, without raising it

up— Q. That is, if you had taken time you could have seen it? A. Yes, sir. Q. You did not look to see what kind of appliances were there? A. I did not have time. Q. You did not look, did you? A. I could not have seen if I had looked after I got up there. Q. Answer my question. A. That is as near as I can answer it. * * *"

On re-examination he said:

"Q. How far were the two cars apart at the time you stepped in? A. About four or five car lengths. Q. You walked along with the moving car, shaking the link and testing it? A. The link was fast in the drawbar. Q. Did you loosen it? A. I took the pin, and drove it, and pounded it up, and loosened it. Q. Was the car coming back while you were doing this? A. Yes, sir. Q. When did you give the signal to the engineer, now, where you swung your lantern out? A. From between the cars. Q. At what place,—after you had loosened the link, or before? A. After I had loosened the link. Q. Were the cars close together, or far apart, after you gave this signal to the engineer? A. Right close together. Q. How far apart were the cars at the time you swung the lantern out to give the signal to the engineer,—about, if you know or are able to state? A. About four feet, I should judge,—four or five feet. Q. Immediately after swinging the lantern is when you raised it up, I understand you to say, to look? A. Yes, sir. * * * Q. They were moving so slow you did not think it necessary to give any signal to stop until they were within four or five feet of the stationary car? A. They were not. Q. You did not run ahead and make any examination of the stationary car? A. No, sir. Q. Before you gave the signal to stop? A. No, sir; I did not think I had time to run ahead."

On re-examination he said:

"Q. When you say you did not have time to examine the cars, I will ask you whether you refer to having time before you commenced to make the coupling, or that you did not have time to observe after you held your light up? A. I did not have time when I held my light up, or before, either. Q. If your light had been burning, would you have had time to have seen? A. Yes, sir; I could have stepped right in there before they would have caught me, if I had had the light to see. They come out towards the end. They won't pinch a man up towards the ends. They are kind of round on the ends, on the corner. A man can stand way out and make a coupling, and they won't get hurt; but, if he stands right up straight, they will pinch him."

The main exception and the chief assignment of error were to the court's instruction to the jury to return a verdict for the defendant.

Hurd, Brumback & Thatcher, for plaintiff.
Clarence Brown, for defendant.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

TAFT, Circuit Judge (after stating the facts as above). Upon the issue as to whether the oil was defective, the court found that there was not sufficient evidence to go to the jury, and therefore directed a verdict for the defendant. In this we think the court erred. In the remarks with which the court prefaced its charge to the jury to bring in a verdict for the defendant, the court proceeded on the theory that in the federal courts, in every case in which the evidence, taken as a whole, is such that, if a verdict should be rendered in favor of one party, the court would feel obliged to set it aside on the ground that it is against the weight of the evidence, it is the duty of the court to direct a verdict in favor of the party adducing the stronger proof. We have examined this question at great length in the well-considered case of Railway Co. v. Lowery, 43 U. S. App. 408, 20 C. C. A. 596, and 74 Fed. 463. In that case the opinion of the court, delivered by Judge Lurton, shows the clear distinction between the function which the court has to discharge after a verdict has been rendered, in de-

termining whether it is so much against the weight of the evidence as to require it to be set aside, and the function which it discharges in deciding, upon a motion to direct a verdict, whether the evidence supporting the issue upon one side is of such an inconsequential character that in law it cannot support a verdict. In the case at bar the court proceeded to weigh the evidence on both sides, and, finding that the evidence tending to show that the oil was of good character so far outweighed the evidence to the contrary that he would be obliged to set aside a verdict based on the view that the oil was defective, he directed a verdict for the defendant. This was beyond the power of the court. If no evidence as to the character of the oil had been introduced by the defendant company, the evidence for the plaintiff was certainly strong enough to support a verdict based on the theory that the oil was defective.

But, though the court reached the conclusion to direct the verdict on an erroneous ground, we are of opinion that the conclusion can be supported on another ground, and that the direction to find a verdict for the defendant was right. It seems to us clear, from the testimony of the plaintiff himself as to how the accident occurred, that he was guilty of negligence causing the accident, and this without respect to the character of the oil. It is perfectly evident from what he states that he knew that the moving car to be coupled was a Pennsylvania car. If he did not know it, he ought to have known it, because he fixed the pin in the drawhead some time before the two cars came together, and the sill at the end of the car, the presence of which required peculiar care in coupling, was just above the drawhead, and so near to it that it was impossible that he did not see the sill if he saw the drawhead as he said he did. Indeed, he does not deny that he knew that the moving car was a Pennsylvania car with a sill. He also states that he could see and did see the drawhead of the stationary car, and could see that the link and pin were properly adjusted in it to make the coupling. If he could see that, as he testifies that he did, it is impossible to explain, except on the theory of negligence and inattention, why he did not see the sill upon that car, for the one was so near the other that with the slightest attention it could not have escaped him. His real explanation of the fact that he did not see the sills was that he did not notice them. Failure to notice a fact so important in determining his proper course, when he had full opportunity to do so, was gross negligence. In view of his admissions his statement that he did not have time to see the sills before the coming together of the cars is certainly not more than a scintilla of evidence to support his case, which, in a federal court, need not be submitted to a jury. The action of the court in directing a verdict was right, and the judgment is affirmed.