PITTSBURGH & W. RY. CO. v. THOMPSON.

(Circuit Court of Appeals, Sixth Circuit. October 5, 1897.)

No. 429.

1. TRIAL—DIRECTING VERDICT.
   Unless there is a lack of evidence on some vital question, sufficient to reasonably support a verdict for plaintiff, it is not error to refuse to direct a verdict for defendant.

2. MASTER AND SERVANT — DEFECTIVE APPLIANCES — RAILROAD CARS — QUESTIONS FOR JURY.
   A brakeman who was directed to ride two loose cars on a downgrade into position for coupling with a standing car was obliged to stand on a shelf, at the end of the moving cars to be coupled, which was three feet below the ratchet wheel of, the brake. While turning the brake, he was caught between the ratchet wheel and the standing cars, and injured. There was evidence tending to show that the latter car was defective, so as to permit the two to come together, leaving only 11½ inches between them. A witness testified that 10 to 12 inches was the usual space between freight cars, and was enough to enable brakemen to handle them with safety. Held, that this evidence would not have justified an instruction that the brakeman assumed all the risks of handling cars having that much space, as this would have ignored the peculiar location and character of the brake wheel.

3. COMPETENCY OF WITNESS—MENTAL UNSOUNDNESS.
   Rev. St. Ohio, § 5240, excepting persons of "unsound mind" from those who are competent as witnesses, is merely declaratory of the common law, which requires that the unsoundness must be such that the witness is in-

capable of understanding the nature of an oath or giving a coherent statement touching the matter upon which he is examined.

4. SAME.

The fact that a person has been found insane by the proper tribunal, and is an inmate of an insane asylum, does not make him absolutely incompetent as a witness, but is prima facie evidence of such unsoundness of mind as will disqualify him, and throws the burden of proving competency upon the party offering him. In such case it is proper for the court to hear evidence, including that of the medical men in charge of the asylum of which he is an inmate, as to the character and extent of his mental unsoundness, and to cause him to be examined upon the questions at issue in the suit, in order to determine how far his mind and memory are unbalanced. If it then appears that, while he has a delusion upon one subject, his evidence is clear, coherent, and consistent, there is no error in admitting it, leaving the question of its weight to the jury.

5. APPEAL—HARMLESS ERROR—EXCLUSION OF EVIDENCE.

Where it was admitted that a witness offered was an inmate of an insane asylum, properly committed thereto, it was harmless error to exclude the record of the inquisition of lunacy, as affecting the question of his competency.

6. SAME—RULINGS ON EVIDENCE—GENERAL OBJECTIONS.

When a general objection is made to the reception of evidence, an appellate court will treat it as nugatory, unless the evidence admitted could under no circumstances have been competent.

7. SAME—PRAYERS FOR INSTRUCTIONS.

A mere general exception to the failure of the court to give nine separate propositions, requested before the argument and charge, and not afterwards called to the attention of the court, is too vague to require any action by an appellate court.

8. MASTER AND SERVANT—INJURY TO RAILWAY EMPLOYES—DEFECTIVE CARS.

The Ohio statute of April 2, 1890 (87 Ohio Laws, p. 149), provides that, in actions by railroad employés for injuries occasioned by defective cars, the company shall be deemed to have had knowledge of such defect, and that this presumption shall stand as prima facie evidence of negligence. *Held*, that this presumption is not overcome by proof that the company employed competent car inspectors, where it is not proved that they actually made an inspection.

In Error to the Circuit Court of the United States for the Eastern Division of the Northern District of Ohio.

This is an action at law brought by Frank H. Wakelee to recover damages for personal injuries sustained by him while engaged in the service of the Pittsburgh & Western Railway Company as a brakeman. After suit was brought, the plaintiff, Wakelee, upon an inquest found, was declared to be an insane person, and letters of guardianship were duly issued to Samuel M. Thompson, who thereupon was suffered to prosecute the pending suit in behalf of his said ward. There was a verdict and judgment in favor of the plaintiff. This writ of error has been sued out to reverse that judgment by the Pittsburgh & Western Railway Company.

Jones & Anderson, for plaintiff in error.

Geo. F. Arrel, L. W. King, and Thomas McNamara, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SAGE, District Judge.

After making the foregoing statement of facts, the opinion of the court was delivered by LURTON, Circuit Judge.

At the conclusion of all the evidence, the plaintiff in error moved for an instruction to find for the defendant, which was overruled. This

82 F.—46

has been assigned as error, and has necessitated the examination of a very voluminous record, containing all the evidence submitted to the jury. In substance, it appears that the plaintiff, Wakelee, at the time he suffered the very serious injury of which he complains, was in the employment of the said railway company as a brakeman, and, as such, was a member of a switching crew in the yards of the company at Painesville, Ohio. On the 4th of October, 1892, six freight cars were received from the Nickel Plate Railroad Company, a road crossing the Pittsburgh & Western at Painesville. These cars had been placed on a transfer track by the Nickel Plate Company, and were removed to the yards of the Pittsburgh & Western Company by an engine and the switching gang of which Wakelee was a member. One of these cars was owned by a private company, and is known and designated in the record as "Car 96, G. H. H.," and this car is alleged to have had a defective drawbar, and to have been the direct occasion of the injury to Wakelee. In the course of the distribution of these cars in the yard of the Pittsburgh & Western Company, it came about that this car No. 96 was cut out from the rest, placed on one of the yard tracks, and blocked. It then became necessary to move two others of the same draft of cars down to this standing car, to be coupled to it. To this end, the two cars, after being cut out, were started on a downgrade in the direction of the alleged defective car, and Wakelee ordered by his conductor to ride them into position for coupling. The brake by which these moving cars were controlled was at the end of the car next the stationary car, and the brake wheel was at the upper end of an upright brake staff, and about 13 inches above the top of the car. To handle this brake, the brakeman was obliged to stand on a narrow step or shelf at the end of the car, about 23 inches below the top of the car. Thus, the proper position of the brakeman would place him on a shelf about 3 feet below the brake wheel, and between the two cars to be coupled. These two cars came together while Wakelee was setting the brake by swinging against the wheel with both hands. The two cars came so close together that the top of the stationary car struck Wakelee in the back, just at the base of the spinal column, and squeezed him between the outer rim of the brake ratchet wheel and the top of the defective car. From this he sustained permanent and serious injuries.

Two special inquiries were submitted to the jury upon which they were instructed to find, the first of which was: "Was the car No. 96, G. H. H., so defective when it passed into defendant's control and use as to make it dangerous for trainmen to handle it?" To this the jury answered, "Yes." The second interrogatory was in these words: "Was the car 96, G. H. H., inspected by defendant's inspectors when it was received into defendant's use?" The answer to this was, "No." In addition, the jury returned a general verdict in favor of the plaintiff. These two interrogatories presented the principal issues of fact involved in the case, and upon each the jury have definitely found in favor of the contention of Wakelee. The argument of the learned counsel in support of the proposition that the court erred in not instructing the jury to find for the defendant railway company is based chiefly upon the contention that there was no sufficient evidence in support of the claim that this car was so defective as to be danger-

ous to handle by trainmen. This is chiefly predicated upon the assumption that Wakelee's evidence, as a witness for himself, is so thoroughly contradicted by the testimony of other witnesses and by the circumstances of the case as not to be worthy of going to the jury. Counsel for plaintiff in error admit that this car 96 was in a defective condition, but say that the defects were not such as to enable the drawhead to slip back under the car, or to cause the cars to come closer together than if in a sound condition, and that the defects which in fact existed had nothing to do with the injury to Wakelee. This car was inspected by Murphy, an inspector for the Nickel Plate Company, on the day it was transferred to the Pittsburgh & Western Company, who made a record in these words: "G. H. H. bro. draw & Int-sill bro. end ceiling & C. plate bolts, transferred and ret: 10-4." Murphy testified that he had no recollection of this car or of its inspection, and could only speak from this entry made by him in a book kept by him for his own satisfaction. He explains his record by saying that it means that the center and intermediate sills were broken and the end ceiling, —that is, the upright planks at end of the car,—and that certain center bolts were broken, how many the entry does not show; that the extent of these breaks he never inserts, but would not have passed the car unless he had supposed it safe to handle; and that the defects he made a note of would not enable the drawhead to slide back or make the car dangerous to handle. He further says if he had found the draft timbers broken and the follower gone, he would have noted it, and marked the car defective and dangerous. The draft timbers, as shown by the evidence, are heavy timbers under the center sill and on either side of the drawhead, forming a slot to hold it up and in place. If these timbers were broken or loosened, so that they could be pushed aside, the flange on the drawhead might not hold it in place, and the drawhead might be pushed back under the car, so that they would come closer together. These draft timbers are bolted to the sill and to the floor of the car. Upon the other hand, Wakelee testified that, very shortly after he was hurt, he examined this car, and found that "the drawsill was all broken on one side, and the intermediate sill was broken, and the end sill where the flange on the drawhead comes against it was all chawed out in them. The draft sill was broken back where the followers are bolted in. The draft timber was broken out sideways. It was shivered and broken and pressed right out sideways." Witness, on cross-examination, explained what he meant by "draft timbers," saying:

"What I call the 'draft timber' is timbers that are alongside the drawhead, and hold the drawhead in place, where the followers and springs are bolted into. [Sic.] Q. Was the sill above that broken? A. Yes, sir; weakened. Q. Both draft sill and draft timber was broken? A. Yes, sir. Q. Were the bolts broken? A. I did not examine the bolts to see whether they were broken or not. Q. You noticed that the follower was broken? A. It was gone altogether."

This witness was examined and cross-examined at great length concerning the injuries to this car, and it is very clear, both from his evidence and that of experts, that, if the car was in the condition to which he testified, the drawhead might slide under the car, and thus

bring the cars much more closely together than otherwise. This presented a very sharp conflict of fact, and Murphy admitted that if he had found the draft timbers broken and pushed sidewise and the follower gone, as described by Wakelee, he would have regarded the car as dangerous, and would not have received it. Mulqueeny, inspector for the Pittsburgh & Western Company, at Painesville, had no record concerning this car, and no recollection of its inspection, and could only speak as to his habit and course of business, from which he believed he had passed this car as not dangerous to handle. In addition to this, there was some opinion evidence to the effect that defects such as those noticed in Murphy's record would make the car dangerous to handle, and the drawhead liable to give way. It is clear from this statement, without going more largely into the details of the evidence, that there was evidence that the draft timbers which hold the drawhead in place were defective, and defective to such an extent that, when these cars came together, they might give, and thus permit the drawhead to slide back in such way as to bring the car ends as close together as the deadwood on them would permit. There was therefore evidence of a defect in a vital particular, having a direct relation to the injury sustained by Wakelee.

The question of the credibility of Wakelee was one for the jury. If his evidence on this point was believed, he made out the most vital point in his case; and, unless there was some other vital question in the case upon which there was no such evidence as would reasonably support a verdict in his favor, it was not error to submit the issues to a jury. But it is next contended that there was no evidence tending to show that, even if this drawhead was defective, it brought the cars so close together as to subject Wakelee to any unusual risk, and that the court should, on this ground, have instructed for the defendant below. This contention rests upon the evidence of one Stevens that the usual space between box cars when brought together for coupling is from 10 to 12 inches, and that that space has, by experience, been shown to be enough to enable trainmen to handle such cars with safety to themselves. On this evidence, it is insisted that Wakelee, under his contract of service, assumed all risks incident and usual to his employment, and had no right to expect that more than 10 or 12 inches of space would exist between the cars he was handling, and should have protected himself accordingly. Tuttle v. Railway Co., 122 U. S. 195, 7 Sup. Ct. 1166. To have instructed the jury to find for the defendant upon this ground would have been to assume that the evidence conclusively established that the protection afforded by the deadwood and drawhead on the Lehigh Valley car, on which Wakelee was standing, was in excess or equal to the usual space between two cars in perfect condition, and to have ignored the fact of the peculiar location of the brake wheel and brake step which Wakelee was compelled to use in handling these cars. The witness Anderson did say that the deadblock and deadwood plus the drawhead of the car on which Wakelee was braking would prevent that car from coming nearer to the defective car than $11\frac{1}{2}$ inches. The same witness also said that, ignoring the defective drawbar, the deadwood on car 96 was $9\frac{1}{2}$ inches thick, including, possibly, the block under the deadwood. The evi-

dence of Anderson therefore comes to this:    That the deadwood on the two cars added to the extension of the drawbar beyond the deadwood of the Lehigh Valley car gave a space of 21 inches between the cars, even if the drawbar of car 96 was defective, as claimed.    But to have taken this question of the space between these cars from the jury upon Anderson's evidence would have been to ignore the positive evidence of Wakelee that there was no deadwood on the defective car.

In the late case of Railway Co. v. Lowery, 20 C. C. A. 596, 598, 74 Fed. 463, 465, we had occasion to deal with the whole subject of the duty and power of a trial judge to instruct a jury to find for the one party or the other, and, in considering the power of this court to reverse a judgment for refusing a request to so instruct, we said:

"In the solution of this question, we are not to weigh the evidence, nor to determine the value of conflicting evidence. The question when a motion to direct a verdict is made is this: Is there any material and substantial evidence, which, if credited by the jury, would in law justify a verdict in favor of the other party? If there was, it cannot be held error that the trial judge declined to direct the verdict, and submitted the value of that evidence to the consideration of the jury."

In Pleasants v. Fant, 22 Wall. 116, Mr. Justice Miller said, touching the duty of the trial judge, that:

"In the discharge of this duty, it is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor; not whether, on all the evidence, the preponderating weight is in his favor,—that is the business of the jury; but conceding to all the evidence offered the greatest probative force which, according to the law of evidence, it is fairly entitled to, is it sufficient to justify a verdict?"

Applying these well-settled principles, it must be conceded that the court below could not ignore the evidence of Wakelee that there were no deadwoods on this defective car.    If the jury should accept Wakelee's evidence rather than the vague and speculative evidence of Anderson to the contrary, and should also find that the drawbar of car 96 was defective, as testified to by Wakelee, it would follow that the two cars, when brought together for coupling, would have no space between them other than that afforded by the drawbar and deadwood of the Lehigh Valley car, a space of but 11½ inches.    Assuming this space to have existed on the uncontradicted evidence in the case, would it have been proper for the court, on the evidence of Stevens that from 10 to 12 inches was safe, and was the usual space between cars so brought together, to have instructed the jury that Wakelee had assumed all the risks incident to handling cars where a space of that much existed when brought together?    We think not.    To have done so would have been to ignore the peculiar location and character of the brake wheel on this Lehigh Valley car, and the position in which Wakelee must have stood in order to apply the brake and control the movements of the cars he was directed to ride.    A space of 11½ inches between cars might be sufficient for a man on the ground between the cars, but not sufficient to set a brake while standing on a 10-inch shelf between the ends of two cars.    Stevens did not say that from 10 to 12 inches was the usual space between cars where the brake was so situated, nor that that space, under the circumstances of this case, was

usual or safe. The duty expected from Wakelee was that he would control the speed of these cars moving on a downgrade, and check them at the right moment. To do his duty required the full strength of the operator, and that it should be exerted by swinging against the ratchet wheel with both arms. The fact that this ratchet was but 3 feet above the step on which he was required to stand would seem to involve more or less bending of the body, and consequently more space than a mere coupling from the ground. The question was one for the jury, and was properly submitted to them. The question as to whether Wakelee assumed a careless and unnecessary posture, and thus brought his injury upon himself, was one of contributory negligence, and was properly submitted to the jury, under an instruction exceedingly favorable to the plaintiff in error.

We come now to the question of Wakelee's competency as a witness. When he was offered as a witness, counsel stated that he was a person of unsound mind, and at the time an inmate of an insane asylum, having been committed under an inquisition of lunacy. When objection was made to his competency, the court heard evidence, including that of the medical men in charge of the asylum of which he was an inmate, as to the character and extent of his mental unsoundness, and also caused him to be elaborately examined upon the questions at issue in the suit, that it might be determined to what extent he was unsound and how far his mind and memory were out of balance. After a full consideration of all this evidence, the court ruled that he might be heard, and that the jury should determine, under proper instructions, how far his mental state affected his memory and credibility. This is now assigned as error. The practice followed by the court in this matter was that approved by the supreme court in District of Columbia v. Armes, 107 U. S. 519, 2 Sup. Ct. 840. The general statement that at the common law a person non compos mentis is incompetent to testify is doubtless true. Hartford v. Palmer, 16 Johns. 143; Cannady v. Lynch, 27 Minn. 435, 8 N. W. 164.

In the case of Reg. v. Hill, 5 Cox, Cr. Cas. 259, the proper meaning of this general statement of the rule was under consideration, and the chief justice said:

"Various authorities have been referred to which lay down the law that a person non compos mentis is not an admissible witness. But in what sense is the expression 'non compos mentis' employed? If a person be so to such an extent as not to understand the nature of an oath, he is not admissible. But a person subject to a considerable amount of insane delusion may yet be under the sanction of an oath, and capable of giving very material evidence upon the subject-matter under consideration. The proper test must always be, does the lunatic understand what he is saying, and does he understand the obligation of an oath? The lunatic may be examined himself, that his state of mind may be discovered, and witnesses may be adduced to show in what state of sanity or insanity he actually is. Still, if he can stand the test proposed, the jury must determine all the rest."

In the case of District of Columbia v. Armes, cited above, the supreme court, referring to Reg. v. Hill, said: "The doctrine of this decision has never been overruled, that we are aware of;" and added: "The general rule, therefore, is that a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding

to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters he has seen or heard in reference to the questions at issue; and whether he have that understanding is a question to be determined by the court, upon examination of the party himself and any competent witnesses who can speak to the nature and extent of his insanity."

But it is said that the Ohio statute makes a person of unsound mind absolutely incompetent. Section 5240, Ohio Rev. St., is in these words:

"All persons are competent witnesses, except those of unsound mind, and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

But the question remains, who is a person of unsound mind? That the person has been found insane, and is an inmate of an insane asylum, affords prima facie evidence that he is of unsound mind, within the meaning of the provision, and operates to throw the burden of proving competency upon the party offering him. This was the ruling of Judge Ricks, who tried this case, and, in our judgment, was a correct exposition of the law. Whether he was so unsound in mind and memory as to be totally incapable of testifying is as open a question under this statute as at the common law. The statute is but a declaration of the common law. To suppose that it was meant to disqualify every person who is of any degree of unsoundness would bring about an intolerable condition of things, and, under such circumstances, it is not to be presumed that the common law was intended to be altered or modified to any greater extent than indicated by a reasonable construction of the words of the statute. To say that a person of unsound mind is incapable of testifying is but to state the general rule of the common law. But at the common law the unsoundness must be such as that he is incapable of understanding the nature of an oath or giving a coherent statement touching the matter upon which he is examined. In Cannady v. Lynch, 27 Minn. 435, 8 N. W. 164, a similar statute was held not to extend the exclusiveness of the common law. The preliminary examination developed that Wakelee had a delusion touching his physical condition, but that on all other matters he was sound. His evidence was clear, coherent, and consistent, as shown by this record, and there exists no reason to doubt his capability of testifying fully and truthfully. We think the court did not err in permitting him to be heard as a witness.

Upon the preliminary examination the defendant below offered as evidence of his unsoundness the record of the state court adjudging him insane, and committing him to an asylum. Upon a general objection this was excluded. The record is silent as to the ground for this ruling. The record in the lunacy case, as contained in the transcript before us, is not a properly certified record, and it may be that this was the ground of exclusion. We ought not to reverse if the ruling was correct for any reason. But, whether properly or improperly excluded, the ruling was wholly immaterial. The fact of commitment to an asylum for the insane was admitted by Wakelee's counsel, as well as proven by Wakelee's medical attendants. He was produced in

court by the authorities having him in custody, and the fact of present mental unsoundness was not a disputed issue. No harm could possibly result from the exclusion of this record of commitment.

Another error relating to evidence remains to be considered. Wakelee was recalled and examined as to statements made to him by one Roe, contrary to his evidence in court, Roe having been theretofore examined as a witness for the railroad company. It is said that this evidence as to Roe's statement out of court was incompetent, no sufficient ground having been laid for thus contradicting him. The objection was not specific. If the ground now stated had then been made the basis for the objection, the evidence might have been excluded, or Roe might have been recalled on a proper showing, and ground laid for this evidence. When a general objection is made to the reception of evidence, without stating the ground of the objection, this court will treat the objection as vague and nugatory, unless the evidence admitted could under no circumstances have been competent. Noonan v. Mining Co., 121 U. S. 393, 7 Sup. Ct. 911; Toplitz v. Hedden, 146 U. S. 252, 13 Sup. Ct. 70.

The bill of exceptions shows that defendants below, before the argument of the cause, handed to the court a series of nine propositions of law, with the request that they should be each charged, "separately, as the law applicable to this case." After the delivery of the court's instructions to the jury, the defendant reserved an exception in these words: "Defendants except to the refusal of the court to give to the jury separately all of the requests asked by the defendant." It is now insisted that if any one of this long series of propositions should have been given, and was not included or covered by the charge as delivered, the judgment must be reversed. Several of the propositions contained in this series of requests were substantially given. Others were not included because not sound law. Possibly one or two of the series were applicable, and would doubtless have been given if the attention of the court had been specifically called to the omission. It is well settled that an exception to a charge, in order to be available upon a writ of error, should be specific, and point out distinctly the matter deemed erroneous. Carver v. Jackson, 4 Pet. 1; Unitarian Church v. Faulkner, 91 U. S. 415; Burton v. Ferry Co., 114 U. S. 474, 5 Sup. Ct. 960. So it is equally well settled that a general exception to the refusal of the court to grant a series of instructions presented as one request will be of no avail for the purpose of reversing the judgment, although it may happen that some of the series ought to have been given. Harvey v. Tyler, 2 Wall. 328; Worthington v. Mason, 101 U. S. 149; Bogk v. Gassert, 149 U. S. 17, 13 Sup. Ct. 738; Moulor v. Insurance Co., 111 U. S. 335, 4 Sup. Ct. 466. An exception in the general terms of the one under consideration, by which it is sought to put the court in error for failing to give a series of propositions requested before the argument and charge, and not repeated afterwards, is too vague. The object of an exception is to definitely call the attention of the court to either an omission in the charge, or to some affirmative misstatement. The exception must be taken while the jury is at the bar. Johnson v. Garber, 19 C. C. A. 556, 73 Fed. 523. The reason for requiring that exceptions shall be definite, and made while the

jury are at the bar, is that the court may correct the error or omission pointed out. The exception for failing to give this entire series of requests could not serve this purpose, as it did not advise the court of any particular omission.

Propositions Nos. 2, 5, 6, 7, and 8 presented different phases of the question of the presumption as to the proper inspection of cars and machinery coming upon one road from another, and of the discharge of duty by inspectors. Each of these requests was faulty in totally ignoring the Ohio statute of April 2, 1890, the second section of which provides that it shall be unlawful for any railroad company to knowingly or negligently use or operate any defective car, and that, in actions by an employé for an injury by reason of such defect, the company shall be deemed to have had knowledge of such defect, and that this presumption shall stand as prima facie evidence of negligence on the part of the company. 87 Ohio Laws, p. 149. This act was construed by the supreme court of Ohio in Railway Co. v. Erick, 51 Ohio St. 146, 37 N. E. 128, the court saying:

"The presumption of knowledge of the defect before and at the time of the injury is, by this statute, chargeable to the company; and this statutory presumption cannot be overcome by proof of facts which only raise a presumption that the company did not have such knowledge. Competent and careful inspectors are presumed to properly inspect the cars and their attachments, but such presumption would not overcome the statutory presumption of knowledge of defects before and at the time of the injury. It would take an actual and proper inspection, or its equivalent, to overcome the statutory presumption of knowledge of such defects. It will be noticed that this section of the statute also provides that, in the trial of a personal injury case against a railroad company, the fact of such defect in its cars or their attachments shall be prima facie evidence of negligence on the part of such corporation. It will be noticed that it is not the servants or such as are fellow servants that are deemed guilty of negligence, but the corporation itself. In such case, when the plaintiff has shown that he was injured, and that such injury was caused by a defect in the cars or their appliances, the statute raises the presumption of negligence on part of the company, and the burden of proof is thrown upon the company to overcome the prima facie case of negligence thus made by the statute."

There was no direct evidence that this car was ever inspected by this company, and the question as to whether such an inspection was ever in fact made by the plaintiff in error was submitted to the jury, who found that no inspection was made when received by the defendant company. The statutory presumption of negligence was therefore not overcome, and the requests we have referred to were properly refused, as altogether ignoring this presumption. The judgment must be affirmed.