Nippert, J.
Opinion overruling motion for a new trial.
On January 31, 1918, tbe jury in tbe above case returned a verdict of manslaughter against tbe defendant, James Brown, finding bim guilty of unlawfully billing Sabin Hollister, on tbe night of November 8, 1917, tbe said Sabin Hollister at tbe time of bis death being an inmate of Longview Hospital for tbe Insane, located at Carthage, Hamilton county, Ohio.
Defendant’s attorney, in filing a motion for a new trial, laid particular stress upon the fact that tbe court committed error in permitting two of the state’s witnesses to testify, claiming that tbe said witnesses were, at tbe time of the occurrence concerning which they were to give their testimony, inmates at Longview Hospital for the Insane, having been committed to that institu *386 tion as insane after proper inquest was had. into their sanity at the Probate Court of Hamilton County, as provided 'by law.
The facts in the case may be summarized about as follows:
Sabin Hollister, the decedent, and Ralph I. Marshall, one of the witnesses whose testimony was objected to, were committed to Longview by the Probate Court of Hamilton County, Ohio, on the morning of November 8, 1917. Upon their arrival at the institution they were both confined in what is known as the “bum room” of cottage male ward No. 1. The term “bum room” is .applied to the receiving ward for male inmates of the institution, where they are placed under “observation” for a period of about thirty days before they are distributed to the other wards of the institution according to the nature of their particular ailment. This “bum room” contained on the day of the murder about thirty patients, of whom five slept in beds, while about twenty-five slept on strawticks on the floor, according to the testimony of Walter Bennett, the senior day attendant. The testimony further showed that on November 8th, about 5:30 p. m., the inmates of this particular ward went to the so-called “bum room dining hall” and immediately after supper were ordered to bed. This was about 6 :15 or 6:30 in the evening. The testimony is uncontradieted that Sabin Hollister, at the time of his commitment, was in good physical condition, showed no 'bruises of any kind upon his 'body; that he was a man weighing about one hundred and seventy pounds; and about five feet eight inches tall; that prior to his commitment he was a patient at the psychiatric ward of the City Hospital, where, according to the testimony of Dr. Raman, he was considered a jovial, harmless sort of a character and gave no trouble whatsoever to the attendants. About 7:30 p. m., the day attendant in the “bum room” at Longview is relieved by the night attendant, in this case A. E. Barlow, whose duty it is to look after the wants of the patients during the night and see that no harm or injury befalls any of them. The witness, Marshall, occupied the straw-tick nearest to the door where Barlow’s chair and table were located; next to Marshall’s straw-tick was that of Sabin Hollister, the decedent. Opposite Hollister’s straw-tick was the wash-room. Some time during the *387 early part of the evening Hollister went into the wash-room to use a cuspidor in a manner not permitted by the rules of the institution. Barlow, the night attendant, called to his assistnee the defendant, James Brown, who had charge of another ward on the same floor, about one hundred feet north of thq “bum room.” A scuffle ensued in the wash-room between Barlow and Brown (the attendants), and Hollister, the inmate. Hollister was roughly handled by both men and dragged back to his place on the floor; a short time after, suffering great pain from the assault committed upon him, he became restless. Thereupon, Barlow again called upon his colleague, Brown, for assistance, and both men, according to the testimony of Marshall, assaulted Hollister by kicking and beating him about the chest, ribs, abdomen, kidneys and spinal column, from the result of which Hollister died about midnight, and his lifeless body was dragged by the two attendants into a so-called “strong room,” from whence it was later removed to the wash-room of the hospital ward and prepared for the undertaker by an inmate, Harry Grear. The report' turned into the superintendent’s office by the two attendants showed that Hollister died of “convulsions.” The only eyewitness to the various assaults upon Hollister was Ralph I. Marshall, who occupied the mattress next to him in the “bum room,” and the only eyewitness to the fact that Barlow called Brown to assist him in subduing Hollister was Sam Glancy, who occupied a cot in the north ward in charge of Brown.
It was mainly on the testimony of Marshall and Glancy, corroborated by the coroner’s inquest upon the body of Hollister, that the jury found James Brown guilty of manslaughter.
The post mortem performed upon the remains of Hollister by Coroner Dr. B’auer and Dr. Howard showed thirty-one separate and distinct fractures of the ribs on both sides of the body, two distinct fractures of the sternum, lungs pierced by two of the fractured ribs, while the left kidney was completely ruptured, causing an extensive abdominal hemorrhage.
The defendant, Brown, was jointly indicted with A. E. Barlow,* for murder in the first degree, by the grand jury of Hamil *388 ton county, on November 16, 1917. Brown testified that previous to Ms employment at Longview he had served three years in the Philippines and upon his return worked in a West Virginia coal mine, and just prior to his employment as an attendant in the "observation ward” of Longview was, to use his own words, a "roustabout.” He had never seen a lunatic until he went to Longview. He denied the charges contained in the indictment and claimed that he only struck or pushed Hollister once, in the beginning of the affray, and that he did that in self-defenSe when Hollister^ attempted to strike him, and that he did not put either his hands or his feet on Hollister at any time after that, and if any great injury was done to Hollister, resulting in his death, it must have been done by Barlow during defendant’s absence.
Brown’s claim of self-defense is directly contradicted by the testimony of Ralph Marshall, an inmate of the "observation ward” at the time when the crime was committed, and who was the chief witness for the state. To the admission of Marshall’s testimony defendant’s counsel has raised serious objection, and claims prejudicial error by reason of the court permitting his testimony to go to the jury.
Section 11493 of the General Code of Ohio provides as follows :
"All persons are competent witnesses except those of unsound mind, and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly.”
Strange as it may seem, there is no published report to be found in Ohio interpreting that part of our statute referring to persons of unsound mind, .although there are numerous decisions in almost every state of the Union and in the federal courts on what is meant by persons of unsound mind and their competency as witnesses.
The common law anciently rejected the testimony of the insane as incompetent, but Sir Edward Coke, in the early part of the seventeenth century, in his Commentaries upon Littleton, Vol. 2, Lib. 3, Chap. 6, Sec. 247a, qualifies the ancient commpn *389 law doctrine and divides those of unsound mind into. four distinct groups, as follows:
“Non compos mentis is of four sorts:
“1. Ideota, which from his nativitie, by a perpetuad infirmitie, is non compos mentis.
“2. Hee that by sieknesse, griefe, or other accident, wholly loseth his memorie and understanding.
“3. A lunatique that hath sometime his understanding and sometime not, aliquando gaudet lucidis intervallis, and therefore he is called non compos mentis, so long as he hath not understanding.
“Lastly, hee that by his owne vitious act for a time depriveth himselfe of his memorie and understanding, as he that is drunken.”
Thus, a lunatic is called non compos mentis only “so long as he hath not understanding, ’ ’ and is not a lunatic whenever he enjoys lucid intervals. However, those who were unfortunate enough to be mentally unbalanced were evidently not given the benefit of their lucid moments and had no legal status during those centuries when insane asylums were unknown, and later, when these asylums did exist, they were merely prisons for the insane, no attempt being made to cure or heal the inmates of their physical and mental ailments.
That this medieval condition of affairs does still exist in many of our states and counties, is a fact that seems almost beyond belief. (See January, 1917, issue of “Mental Hygiene,” Dr. Thomas W. Salmon, “The Insane in a County Poor Farm.”)
It can not be maintained truthfully that this lack of care is due to the poverty of the respective states or communities. Therefore, it must be due either to the lack of interest on part of the state in its unfortunate ones, or gross neglect of duty on part of those charged with the grave responsibility of the care of these public charges.
It is only in more recent years that some of our states have given the inmates of insane asylums the benefit of the services of trained psychologists .and mental experts and have given the patients the advantage of trained nurses, laboratories, therapeutics, operating rooms, etc. In other words, these states have *390 made their hospitals for the insane hospitals in fact, and not in name only. Whether or not such is generally the case in Ohio, this court is not advised, but submits this question to the brethren of the' medical profession for determination.
It was not until the year 1851 that the Court of Criminal Appeal of England laid down a more reasonable and humane interpretation of the ancient common law in the now leading case of Regina v. Hill, reported in Cox’s Criminal Law Cases, Vol. V, page 259, which gives a sound and practical value to the qualifications indicated by Coke two hundred and fifty years prior.
In the Hill case an attendant was convicted of manslaughter of an inmate of an insane asylum, and the star witness for the state was, at the time of the commitment of the crime, an inmate of the ward in which the murder was committed, and it was on his testimony that the attendant was convicted. The testimony of the insane witness was attacked by the defense on the general proposition that the testimony of a lunatic was inadmissible. Donelly, the witness, was, both at the time of the occurrence upon which he gave his testimony and at the time of the trial, non compos mentis, in the legal, medical and ordinary sense of the term. He was declared by one of the medical witnesses to be, in the strict sense of the term, a lunatic, laboring under an insane delusion from which he was never free, and exhibited the characteristic symptoms of insanity which are said to be “a confirmed belief in an assumed idea upon which the patient is always acting, without any apparent bodily disease, to the truth of which he would pertinaciously adhere in opposition to the plainest evidence of its falsity.” Lord Campbell, in his opinion in the Hill case, asks this very pertinent question, to-wit:
“In what sense is the expression non compos mentis employed?”
He then proceeds:
“ If a person be so to such an extent as not to understand the nature of an oath, he is not admissible. But a person subject to a considerable amount of insane delusion may yet be under the sanction of an oath and capable of giving very material evi *391 dence upon the subject-matter under consideration. * * * The proper test must always be, does the lunatic understand what he is saying, and does he understand the obligation of an oath? The lunatic may be examined himself, that his state of mind may be discovered, and witnesses may be adduced to show in what state of sanity or insanity he actually is; still, if he can stand the test proposed, the jury must determine all the rest. In a limatic asylum, the patients are often the only witnesses to outrages upon themselves and others, and there would he impunity for offenses committed in such places if the only persons who can give information were not to he heard.”
Judge Coleridge, concurring in Lord Campbell’s opinion, states that—
"There was a disease upon the mind of the witness, operating upon particular subjects, of which the transaction of which he came to speak was not one. He was perfectly sane upon all other things than the particular subject of his delusion. As far as memory was concerned, he was in the position of ordinary persons, and upon religious matters he was remarkably well instructed, so as to understand perfectly the nature and obligation of an oath.”
And Judge Talfourd, in a concurring opinion, stated:
“If the proposition, that a person suffering under an insane delusion can not be a witness, were maintained to the fullest extent, every man subject to the most innocent unreal fancy would be excluded. Martin Luther believed that he had had a personal conflict with the devil; Dr. Johnson was persuaded that he had heard his mother speak to him after death. In every case the judge must determine, according to the circumstances and extent of the delusion. Unless judgment and discrimination be applied to each particular case, there may be the most disastrous consequences.”
The testimony of the insane inmate, Donelly, was admitted; the conviction of the brutal attendant was sustained; and the case of Regina v. Hill has been made the basis of all similar questions which have arisen since 1851, both in England and in the United States.
A similar question was decided in the United States in 1859, in the case of Holcomb v. Holcomb et al, 28 Conn., 177. There the court held:
*392 “The question of competency is for the court and must be settled before the witness is sworn. The state of a person’s mind in this respect may be ascertained by an examination of the witnesses acquainted with him, or by a personal examination of him by the court, or by counsel in the presence and under the direction of the court, or by all of these modes at the discretion of the court. When the court is satisfied that the person (offered as a witness) has capacity sufficient to comprehend the nature and obligation of an oath, he may be sworn as a witness. In the case under consideration, the witness was admitted to testify without objection, no question having been made as to his sanity at the time he was sworn. But the defendants insist that he was insane at the time the facts occurred about which he testified, and that it was competent for them to have shown it at the time to detract from the force of his testimony. The plaintiff claims that insanity is no objection to either the competency or the credibility of a witness, provided he is sane at the time he is sworn; and he relies upon the case of Evans v. Heltick, 7 Wheaton, 453, to sustain his position.’’
Justice Story in that case overruled the objection of the defense “because a person being subject to fits of derangement is no objection either to his competency or credibility, if he is sane at the time of giving his testimony.” But the question of whether the witness was insane at the time of the transaction about which he gave his testimony was not raised in the Evans case. The learned court in the Holcomb case held that—
“ Fits of derangement will not impair the credit of a witness otherwise unaffected, and still the question, as to what is the effect of insanity at the very instant of the transaction, upon the story of the narrator will remain unanswered. * * * The force of all human testimony depends as much upon the ability of the witness to observe the facts correctly as upon his disposition to describe them honestly, and if the mind of the witness is in such a condition that it can not accurately observe passing events, and if erroneous impressions are thereby made upon the tablet of the memory his story will make but a feeble impression upon the hearer though it be told with the greatest apparent sincerity.
“We are therefore of opinion that the insanity of a witness at the time of the transaction about which he is called to testify, does impair the force of his testimony, and is a matter proper to be considered by the triers to whom his testimony is submitted. * * * In the case of Grant v. Thompson, 4 Conn., 208, this *393 court held that it was proper ‘to go into a history of the supposed lunatic’s mind, before, at, and after his contract in order to ascertain his real condition at the moment of entering into the agreement.’ ”
Because the trial court in the Holcomb case did not permit the defendant to introduce such evidence, the case was reversed and a new trial was granted. But the court in its ruling follows the case of Regina v. Hill, of the Court of Queen’s Bench, decided in 1851.
That this question seems never to have been squarely raised in Ohio is evidently partly due to the popular belief which assumes that a person can not be a competent witness while an inmate of an insane asylum, or testify to facts which occurred during his confinement in such an asylum.
In the case of Marshall, whose competency is attacked, it may be stated that he was released from the guardianship of Longview and declared' to be sane about four weeks after the occurrence of the crime to which he claims to have been a witness and he was under no medical or legal restraint at the time he offered his testimony.
Glancy, the other witness objected to, was at the time of the occurrence of the' crime and at the time of the trial still confined at Longview.
When Glancy and Marshall were offered as witnesses for the state, counsel for defendant moved that the jury’ be excused and that an inquest be had in open court into their competency. The burden of proof in the ease of Marshall (who had been released) rested upon the defendant to show that Marshall was incompetent to testify; while in the ease of Glancy (who was still confined at Longview), the burden was upon the state to show that Glancy was competent.
The alertness of mind, as demonstrated by Glancy during his cross-examination, showed beyond doubt not only that he knew the sacredness and obligation of an oath and realized the pains and penalty of perjury, but that he was fully capable, as far as his memory was concerned, to give a coherent and logical account of the occurrences concerning which he was called upon to give his testimony. No medical experts were called in the *394 case of Glancy. But it was different in the case of Marshall. Three well-known alienists and psychiatrists of the city were called upon to give their opinion concerning Marshall’s condition of mind.
Dr. Herman H. Hoppe, of the University of Cincinnati, and -director of the department of mental and nervous diseases at the City Hospital, testified that in the case of Ralph I. Marshall he, in consultation with the staff of the psychopathic ward of the City Hospital, made a provisional diagnosis in Marshall’s case of a paranoiac form of dementia precox, which, Dr. Hoppe explained, means — “a person who undergoes a premature dementing process, and who, while undergoing this dementing process, has ideas of a persecutory character 'based upon hallucinations and delusions, and that such a person is of unsound mind. ’ ’ This examination of Marshall was made at the City Hospital about three or four days prior to November 8, 1917, when he .was committed to Longview. In reply to a question put to the doctor' by defendant’s counsel as to whether or not a paranoiac could relate matters of injury or persecution to another without exercising some exaggeration, Dr. Hoppe answered:
“Yes, sir; they could. * * * I should distinguish between a paranoiac and a parnoiac of the type of dementia precox. The ordinary paranoiac is usually a man of more than average intelligence, and of an acute judgment; and if the fact under consideration does not pertain to his sphere of persecution, he can be a reliable witness to those facts. There are paranoiacs who are working along and going through all the functions of life; but a paranoiac dementia precox is a man who has the paranoiac symptoms coupled with mental weakness; and for that reason what he says may be hampered by the weakness of his judgment, of his inability to put restraint on what he says, or what he sees; so that while a paranoiac may be a good witness in the individual case, in a paranoiac dementia precox type we would have to distinguish, so far as that individual was concerned, how much the mental deterioration had taken place in that individual. * # * I 'believe that they could tell what they saw if what they saw was not in relation to their own persecutory ideas; but a man with dementia precox might give a different version of what he saw because it would be necessarily biased by a weakness of intellect, weakness of judgment, and weakness of perception; because nearly every dementia *395 precox case is living on a lower level of intelligence, ,and therefore he is not as trustworthy a witness as the other. * * * I want to say that that was a provisional diagnosis at that time; that he had this appearance, but there was some doubt in my mind; and the reason of there being a doubt in my mind was that he didn’t have the ordinary history of a typical paranoiac case; to the best of my belief he is a dementia precox case; that is the way I would look at it; that is the way I would like to put it without making it an absolute, positive statement. * * * I should think, and I believe that an ordinary paranoiac could testify to facts outside of his sphere of persecutory ideas, because they can and do take care of all kinds of businesses. * * * I have got one of them now who is a pretty good teacher in the public schools. * * * We never accept the statement of fact of an individual who is mentally unbalanced unless we can corroborate it by some one else or by circumstances.”
Dr. David I. Wolfstein stated that Ralph Marshall was a paranoiac with a mild degree of dementia precox and that such a person was able to give a fairly good account of an occurrence not connected in any way with any of the delusions which are the basis of his mental disorder, and that an individual of that kind has a great many perfectly lucid moments about things not definitely connected with his own particular delusions, although he may be given to exaggeration. When questioned as to whether or not a man of Marshall’s type who is given to exaggeration could give a correct account of what he saw, the doctor answered as follows:
“Yes, he can relate correctly what he sees, certainly.”
When Dr. Wolfstein was asked by defendant’s counsel to give his opinion as to the trustworthiness of the witness, the court sustained the objection of the prosecutor since the trustworthiness or the credibility of a witness is a question entirely within the province of the jury, and the only question at issue at the sanity inquest was the competency of the witness, the determination of which was strictly within the province of the court.
It appeared further from the ‘ testimony that Marshall was employed as a clerk during the past few years in two large mercantile houses of our city, and had not been a very popular em *396 ployee with the other workmen in the place and that they had shown their dislike for him in various ways. One of the witnesses testified that Marshall was not a mixer; that his health was poor; that he did not associate with the other employees who did not like him and stayed away from him. He also stated that they never cared much for him and had little to do with him. He was corroborated in this by the employees themselves. Marshall testified that he felt keenly this hostility of his colleagues and it worried him considerably, so that finally he suffered a nervous breakdown and went to the City Hospital for treatment. The testimony showed that no medical examination of Marshall was made, but that his mental state alone was inquired into at the City Hospital. It developed, however, that after Marshall was released from Longview Hospital for the Insane he had an operation performed on his nose and cheekbone, which has relieved his nervous condition considerably, and which according to the statement of the operating surgeon, was the cause of much of his nervousness.
Marshall was able to satisfy the court of his full appreciation of the sacredness of an oath and of the pains and penalty of perjury. He withstood the test of one of the severest cross-examinations on part of defendant’s counsel ever witnessed by the court. The history of his life, all of the incidents within a month prior to his commitment to Longview, to test his memory, recollection, clearness of perception and ability to relate logically and coherently matters which occurred prior to, at the time of, and immediately after the murder of Hollister, were gone into during this most minute cross-examination. The witness was able to draw a sketch of the ground-plan of the building showing the wards in which he was confined, and the details of the rooms and halls connected with the “bum room.” In fact, he showed his competency as a witness at every point where the same was attacked by defendant’s counsel.
The burden of proof of establishing Marshall’s incompetency as a witness resting upon the defense, and the defense having failed on this point, there was no alternative for the court but to admit Marshall as a witness and leave the question of the *397 trustworthiness or the credibility of his testimony to the jury under proper instructions.
While it is true that our Ohio Supreme Court has no occasion to interpret'that part of Section 11493 of the Ohio Code excepting "persons of unsound mind” from those who are competent as witnesses, we have a decision of the Circuit Court of the United States, Judges Taft, Lurton and Sage presiding, which sustains, not only the court’s ruling in permitting Marshall to testify, but is particularly in point on the question of permitting Samuel Glaney, then an inmate of Longview, to testify. This is the ease of Pittsburgh & W. Ry. Co. v. Thompson, reported in 82 Fed., 720. Judge Lurton, delivering the opinion of the court, interprets Section 11493 of the Ohio Code as follows:
‘‘ That a person has been found insane, and is an inmate of an insane asylum, affords prima fade evidence that he is of unsound mind, within the meaning of the provision, and operates to throw the burden of proving competency upon the party offering him. * * * Whether he was so unsound in mind and memory as to be totally incapable of testifying is as open a question under this statute as .at the common law. The statute is but a declaration of the common law. To suppose that it was meant to disqualify every person who is of any degree of unsoundness would bring about an intolerable condition of things, and, under such circumstances, it is not to be presumed that the common law was intended to be altered or modified to any greater extent than indicated by a reasonable construction of the words of the statute. To say that a person of unsound mind is incapable of testifying is but to state the general rule of the common law. But at the common law the unsoundness must be such as that he is incapable of understanding the nature of an oath or giving a coherent statement touching the matter upon which he is examined.”
Under the Minnesota statute pertaining to the competency of witnesses, Section 9 provides as follows:
"The following persons are not competent to testify in any action or proceeding:
"First, those who are of unsound mind, or intoxicated, at the time of their production for examination. ’ ’
The Supreme Court of Minnestota, in the ease of Cannady v. Lynch, 27 Minn., 436, says:
*398 “It would be contrary to tbe general tenor and spirit of tbe statute to construe the first subdivision of Section 9 as intending to exclude, on account of mental unsoundness or intoxication, those who, at common law, would be competent. The terms ‘of unsound mind’ and ‘intoxicated’ are very indefinite. It is a matter of common observation that persons may be mentally unsound on some subjects, and as to others as sound as people generally; or may be in some degree unsound, or to some extent intoxicated, and yet be capable of recollecting past events accurately, and possess the ability and appreciate the duty to relate them truly, as fully as persons who are sober, and in all respects of sound mind. It is not to be supposed that the statute intends to disqualify such persons. It is more reasonable to suppose it intends to exclude persons as witnesses only when unsound or intoxicated to a degree that would exclude them at common law; that it intends to affirm the common law rule on the subject, and admit persons as witnesses when, at the time they are offered to be sworn, they are possessed of ‘such an understanding as enables them to retain in memory the events of which they have been witnesses, and gives them a knowledge of right and wrong sufficient to appreciate the sanctity and binding force and obligation of an oath.
“ If a person offered as a witness must be tested by this rule, it is evident the test must be applied by the trial court at the time of offering him. His condition at that time must determine his competency.”
The Supreme Court of the United States, in the case of District of Columbia v. Armies, reported in 107 U. S., 519, Justice Field delivering the opinion of the court, following the decision of the Court of Criminal Appeal in the case of Reg. v. Hill, supra, held that—
“A person affected with insanity is admissible as a witness, if it appears to the court, upon examining him and competent witnesses, that he has sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue.”
The symptoms which the various alienists presented to the court as indicating dementia precox of the paranoiac type, such *399 as lack of memory, inability to relate coherently and logically the same occurrences at different times, were peculiarly absent in the case of Marshall during the trial, as well as in the ease of G-lancy, and they both related with surprising intelligence and astonishing clearness of expression the matters at issue concerning which they gave their testimony. This being the case, the court permitted the witnesses to be sworn and give their testimony to the jury, to all of which counsel for defendant excepted.
At the conclusion of all the testimony and the argument of counsel, the court charged the jury very fully and explicitly on the question of the credibility of witnesses, and the jury returned a verdict finding the defendant guilty of manslaughter, which, under all the circumstances of this ease, as well as under the law as viewed by the -court, should not be set aside.
The motion for a new trial is overruled. An entry may be submitted .accordingly.

Barlow plead guilty to manslaughter and has since been sentenced.