15651.    RAY *v.* THE STATE.

Lack of mental capacity to understand the nature of an oath was sufficiently shown by the evidence as to the woman who testified that the defendant was the father of her bastard child; and the court erred in refusing to exclude her testimony.  (BROYLES, C. J., dissents.)

DECIDED JULY 16, 1924.

Indictment for bastardy; from Jeff Davis superior court—Judge Highsmith. April 8, 1924.

Bryant (or Brye) Ray was convicted under an indictment which charged him with being the father of the bastard child of Shug Collins. In the motion for a new trial it is alleged that the court erred in not excluding the testimony of Shug Collins, on the motion of the defendant's counsel, on the ground that she was not a competent witness; that she did not know the nature of an oath and had not sufficient mental capacity to comprehend its meaning. The questions put to this witness, and her answers, are set out in the motion for a new trial as follows: Q. What is your name? A. Shug Collins. Q. Do you know this man here, Brye Ray? A. Yes, sir. Q. Where do you live? A. Mother and father. Q. Is that in this county? A. Yes, sir. Q. You say you knew Brye Ray. Does he live out there where you live? A. Close by. Q. Did he do anything to you a year or two ago? A. Yes, sir. Q. Have you got a baby? A. Yes, sir. Q. Who is the father of that baby? A. Brye Ray. (Cross-examination.) Q. How old are you? A. Twenty-one. Q. What county do you live in? A. Back that way (indicating). Q. What is the name of the county you live in? A. Mama knows. Q. What is the name of the State you live in? A. Mama knows. Q. You do not? A. No. Q. Do you know what an oath is? A. Mama knows. Q. Do you know what an oath is? A. Yes. Q. What is it? A. He tell me to lie down on bed. Q. I am not asking you what Brye Ray told you. What did you mean when you held up your hand, when the solicitor told you to hold up your hand, what did that mean? A. I don't know what you say. Q. You held up your hand a while ago? A. Yes. Q. What did you do that for? A. Because. Q. Because of what? A. Because I wanted to. Q. What did you mean by doing that? You just done it because Mr. Sellers told you to? A. Yes. Q. You don't know what an oath means? A. No. Q. You ever been to school any? A. No. Q. You ever been to preaching any? A. Yes. Q. What did the preacher preach about? A. I don't know. Q. Do you know what you are doing here now? A. No. Q. Do you know what a story is? A. No. Q. Did you ever hear anybody tell a lie? A. Brye Ray, I know him too. Q. Did you ever hear anybody tell a lie? A. He will tell a lie. Q. What is a lie? A. He tell a lie. Q. Did you

ever tell a story? A. No. Q. Do you know the nature of an oath? A. No. Q. What becomes of people that tell stories? A. I don't know what you say. Q. What did they do with folks that tell a story? A. He push me down on bed. Q. I am asking you what becomes of people that tell stories? A. I don't understand your talk. Q. You know anything about heaven? Where do you go when you die? A. Don't go any way. Q. Do you know anything about hell,—ever hear about hell? A. I want him to go to hell and burn in hot fire. Q. Who goes to hell? A. Brye Ray. Q. Anybody else go to hell? A. Him goes. Q. That all that goes to hell? A. Yes. Q. What kind of people go to heaven? A. Me, I go to heaven. Q. You the only kind that goes there? A. Yes, me and my sister. Q. Do you know what the law means to swear a person? A. No. Q. Do you know how the law punishes people? A. Yes. Q. What does the law do with people that violate the law? A. I don't know what you say. Q. What would the law do with you, or the courts do with you, if you swore a story? A. I am not telling a story. Q. Suppose you was to, what would they do about it? Do you know what they would do with you if you were to tell a story? A. No. Q. Do you know Gempsey Quinn? A. No. Q. Have you ever seen him? A. No.

Before the trial judge ruled upon the motion to exclude the testimony of this witness her mother testified: "I am the mother of Shug Collins. . . She has always been a cripple. She is weak minded. The girl lives in the house with me and her father . . and has lived there for fourteen years. She is the mother of one baby. . . I know Bryant Ray. . . He lived out there in the community . . at the time the baby was born, right side of my fence, 50 or 75 yards, and had been living there two or three years. He is a married man. Shug went over there sometimes before the baby was born, visited his family. . . Shug did not go to school, because she was not able to walk to the schoolhouse. . . She couldn't talk sufficiently for the teacher to understand her. She is not what we usually term an idiot. An idiot is a fool, and I don't suppose an idiot would know its mother from anybody else, and I don't suppose an idiot can be bright. . . Q. Is her mind as old a mind as a four-year-old child? A. I suppose so. She can tell me anything I have forgotten three or

four years ago. A four-year-old child is sufficient to commence to learn its A B C's. She has never learned her A B C's. She was never taught anything at all,—no books at all. I commenced with my children when they were three or four years old. She could never talk until she was four years old. We have tried to learn her right from wrong. She went with me sometimes to Sunday school. I never did try to learn her to repeat any conversation. Her mind is not sufficient or capable of grasping such things. . . She cannot count more than three or four. I suppose she could take eight out of a bunch of ten. I have never tried her. She is weak minded. She could not be responsible for her wrong doings. I suppose it is true that we have never tried to hold her responsible for her misconduct like the other children because we knew that, due to her mental capacity, she could not be held accountable. . . She knows right and wrong in a heap of things. She has been taught to do right. It don't look like she could be held responsible for anything she might do. She is kind of weak minded. She knows enough to behave herself, I think she ought to know whether a thing is right or not before we tell her. I don't know her mind. I have taught her to tell the truth. She would leave home once in a while, but I would be right in straight in behind her. I told her not to leave home, but sometimes she would go over to Thomas Quinn's, ·which is about a mile. . . Heap of the times she would go with her brothers."

The court charged the jury: "In view of the contentions made by the parties in this case, I charge you this rule of evidence: that persons who have not the use of reason,—as idiots, lunatics during lunacy, and children who do not understand the nature of an oath, —are incompetent witnesses. This rule of law may be taken into consideration by the jury, along with the other facts and circumstances in the case, and the law given you in charge, in passing upon and considering all of the testimony that may have been submitted to you and in determining whether the guilt of the defendant has or has not been established beyond a reasonable doubt."· In the motion for a new trial it is alleged that the court erred in charging as above, because it was the duty of the court to pass upon the competency of witnesses, and the court should have instructed the jury that they could not consider the testimony of the witness referred to.

*V. E. Padgett,* for plaintiff in error.

*Alvin V. Sellers, solicitor-general,* contra.

BLOODWORTH, J.   The motion for a new trial shows that the court was asked to exclude from the jury the evidence of Shug Collins, the chief witness for the State, because "it is shown that she was not a competent witness," and "it developed from her examination that she was so feeble-minded that she did not know the nature of an oath."   The witness was at least 21 years old, had lived in the county since she was six years old, but, when asked the name of the county, replied, "Mama knows." She said that she did not know the name of the State in which she lived; that she had never been to school, and did not know what she was doing in court; and when asked, "You don't know what an oath means?" answered, "No;" and in answer to the question, "Do you know what the law means to swear a person?" again answered, "No." Her mother testified that she was weak-minded; that she had never learned her A B C's; that she had never learned to count, and could not count more than 3 or 4; and that her mental condition was such that she could not be held responsible for her conduct.

Section 1038 of the Penal Code of 1910 is as follows: "Persons who have not the use of reason, as idiots, lunatics during lunacy, and children who do not understand the nature of an oath, are incompetent witnesses." In section 2 of the Penal Code we find that "Lunatic, insane, or non compos mentis, each includes all persons of unsound mind." According to Black's Law Dictionary, a person of unsound mind is "an adult who from infirmity of mind is incapable of managing himself or his affairs. The term therefore includes insane persons, idiots, and imbeciles." In *Cuesta* v. *Goldsmith,* 1 *Ga. App.* 48, 53 (57 S. E. 983), this court quoted with approval the following from an opinion of Judge Lurton in the case of Pittsburg & W. Ry. Co. *v.* Thompson (C. C. A.), 82 Fed. 726: "The general statement that at the common law a person non compos mentis is incompetent to testify is doubtless true.   Hartford *v.* Palmer, 16 Johns. 153; Cannady *v.* Lynch, 27 Minn. 435, 8 N. W. 164.   In the case of Reg. *v.* Hill, 5 Cox. Cr. Cas. 259, the proper meaning of this general statement of the rule was under consideration, and the Chief Justice said: 'Various authorities have been referred to which lay down the law that a person non compos mentis is not an admissible witness.   But in what sense

is the expression non compos mentis employed? If a person be so to such an extent as not to understand the nature of an oath, he is not admissible. But a person subject to a considerable amount of insane delusion may yet be under the sanction of an oath, and capable of giving very material evidence upon the subject matter under consideration. The proper test must always be, does the lunatic understand what he is saying, and does he understand the obligation of an oath?' . . In the case of District of Columbia v. Armes, cited above, the Supreme Court, referring to Reg. v. Hill, said: 'The doctrine of this decision has never been overruled that we are aware of,' and added: 'The general rule, therefore, is that a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters he has seen or heard in reference to the questions at issue.' " The examination of the chief witness in this case did not show that she, "either from a moral or legal standpoint, understood the nature or obligation of an oath, or had the slightest degree of knowledge with reference to the legal consequences of committing perjury." *Gaines* v. *State*, 99 *Ga.* 704 (26 S. E. 760).

In the light of the evidence quoted above and other evidence shown in the record, we are convinced that the witness Shug Collins has not sufficient mental capacity to understand the nature of an oath; that she has not the "use of reason;" and, under the law stated above, her evidence should have been excluded. Without her evidence there is nothing to support the verdict, and the judgment is

*Reversed. Luke, J., concurs. Broyles, C. J., dissents.*